**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rosario MONTOYA, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Filiberto E. MONTOYA, Defendant–Appellant.**

Nos. 93–50411, 93–50440.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1994.

Decided Jan. 12, 1995.

Juanita R. Brooks, McKenna & Cuneo, San Diego, CA, Paul E. Potter, Potter, Cohen & Samulon, Pasadena, CA, for defendants-appellants.

Edward J. Weiner, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: BRIGHT,* WIGGINS, and T.G. NELSON, Circuit Judges.

Opinion by Judge T.G. NELSON; Dissent by Senior Circuit Judge BRIGHT.

## OPINION

T.G. NELSON, Circuit Judge:

### I.

### OVERVIEW

This case involves the prosecution of a formerly immunized witness and his wife. Filiberto Montoya is a real estate salesperson who was accused of laundering money for alien drug lords by making investments in local real estate. Montoya appeals his conviction following his conditional guilty plea to conspiracy to engage in monetary transactions in property derived from specified unlawful activity and to commit bank fraud, in violation of 18 U.S.C. §§ 371, 1957(a), and 1344. Rosario Montoya appeals her conviction following her conditional guilty plea to making a false statement on a loan

application and aiding and abetting, in violation of 18 U.S.C. § 1014, 18 U.S.C. § 2. The Montoyas' conditional guilty pleas preserved the right to appeal the district court's denial of the motion to dismiss the indictment on the ground that this prosecution is allegedly tainted by Filiberto's status as an immunized witness in a drug investigation focusing on the Contreras–Subias drug organization. We conclude that the district court properly denied the motion to dismiss the indictment on the ground that it was not tainted by the earlier grant of immunity to Montoya; that a *Kastigar* evidentiary hearing was not compelled under the circumstances of this case; and that the district court did not err in refusing to dismiss the indictment on grounds that it was not the result of outrageous government conduct or prosecutorial vindictiveness.

### II.

### FACTS AND PROCEDURAL HISTORY

In May 1988, the Government became aware that a number of real properties in San Diego County were connected with the Contreras–Subias drug trafficking organization. Assistant United States Attorney (AUSA) Warren Reese was assigned to investigate the trafficking activities of this organization (the "Reese investigation"). Early in the investigation, documents obtained as the result of the arrests of members of the Contreras–Subias organization and from searches of the San Diego properties, led to materials indicating that Filiberto Montoya was involved. Montoya had acted as a real estate salesperson in transactions whereby members of the organization, or its nominees, acquired real property. From May through August 1988, documents were collected as a result of the issuance of grand jury and administrative subpoenas.

A separate investigation revealed that Montoya was involved, on behalf of the Contreras family, in a real estate transaction in Oklahoma. This led to indictments of members of the drug organization for money

* Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by

designation.

laundering in Oklahoma, and AUSA Reese was assigned to assist in this prosecution.

In the Fall of 1988, Reese was contacted by an attorney on behalf of Montoya, and they discussed the possibility of Montoya cooperating in the investigation. Reese wrote a letter dated November 17, 1988, granting Montoya informal immunity. The first interview with Montoya took place on November 18, 1988. He was also interviewed in January, February, and May of 1989. Discussions with Montoya led Reese to conclude that Montoya would be called as a witness. Montoya was formally granted immunity and ordered to testify before the grand jury in San Diego in January 1989, and at the Oklahoma trial in May 1989.

In February 1990, Reese prepared a memorandum to the United States Attorney requesting that authority be sought from the Department of Justice to prosecute Montoya for conspiracy to commit bank and mail fraud and money laundering, as well as the substantive offenses. Reese's request explained:

> In weighing the public interest in prosecution, it should be noted that the witness appeared to testify falsely before the grand jury, then recanted when confronted with contradictory evidence. He is also believed to have testified falsely during a trial (although a perjury prosecution could not be sustained), and he did not give complete testimony, as explained below.

Permission was ultimately granted by the Attorney General, and AUSA Amalia Meza, then AUSA Ed Weiner, were assigned to prosecute Montoya (the "Weiner investigation").[1] The Montoyas were indicted on May 7, 1992, for conspiracy to engage in money laundering and bank fraud, and for the underlying substantive offenses.

The Montoyas filed a motion to dismiss the indictment on the ground it was tainted by immunized testimony. The Government filed a response, including nine declarations of the various prosecutors and agents involved in the Reese and Weiner investigations. The Montoyas subsequently filed a motion to cross-examine the nine declarants after the court indicated that it might not hold a hearing on the motion (a *Kastigar* evidentiary hearing).

The district court denied the motion to dismiss the indictment and the motion to cross-examine on November 30, 1992. The court found that "[t]he government, in its response and opposition, met its heavy burden of proof that it obtained the evidence used to indict Montoya from independent sources." The court concluded:

> There was some overlap between the Reese investigation and the Weiner investigation, as the defense contends. However, the Government must prove that it had prior independent sources for the information that lead to Montoya's indictment, not that there was no overlap. The searches of Montoya's property in August of 1988, the subpoenas for records from escrow companies and financial institutions as a result of these searches, and the separate investigations of Agents Morris, Young and Grover all indicate that the Government had more than enough independent evidence to indict Montoya.

Instead of filing a motion for reconsideration, the Montoyas petitioned the Ninth Circuit for a writ of mandamus to compel the district court to vacate its order, conduct a hearing on the motion, including cross-examination of the nine declarants, and file discovery documents.[2] The Government filed a motion for reconsideration with the district court, requesting that it permit filing of the discovery material, review the material, and reconsider the motion to dismiss. The court granted the motion and reconsidered the motion to dismiss in light of the new material.

---

1. Meza took over for Reese after Reese had requested permission to prosecute Montoya, because of Reese's exposure to Montoya's immunized statements and testimony. Meza participated in the Montoya investigation from approximately May 1990 to July 1991. In July 1991, Meza was assigned to another project, and turned the investigation over to Weiner.

2. On the day of the hearing on the motion to dismiss, the Montoyas attempted to file voluminous discovery documents at the judge's chambers. The court refused to allow the documents to be filed because they were late.

On February 2, 1993, the court again denied the motion to dismiss. The court noted that the discovery documents "actually support the Government's assertion that the evidence used to indict Montoya was derived from independent sources," and then described the documents. The court rejected the Montoyas' argument that the discovery documents were inconsistent with the declarations filed by the Government and that therefore an evidentiary hearing was required. The court explained:

The defendants point out that certain declarations state that the declarants did not have information about Montoya's immunized statements or testimony. But reports, by the declarants, make reference to the fact that the Government believed Montoya's testimony before the grand jury and in Oklahoma to be untruthful. The defense seems to argue that this means the declarant had knowledge of the contents of Montoya's statements and testimony. A closer reading of the reports, however, reveals that the declarants are just reiterating a generalized opinion that the Government believed Montoya lied to the grand jury. Nowhere in the voluminous documents submitted to the court are there implications that the declarants, which swore they had no knowledge of Montoya's statement or testimony, knew the content of Montoya's statements or testimony. Importantly, absent such a contradiction, there is no need for an evidentiary hearing.

The district court also denied a separate motion filed by the defendants, requesting that the court dismiss the indictment based on outrageous government conduct and vindictive prosecution, and requesting that an evidentiary hearing be held.

Subsequently, the Montoyas entered conditional guilty pleas,[3] preserving their right to appeal the court's denial of the motion to dismiss the indictment, "based on the contention that information obtained from Filiberto

E. Montoya while he was an immunized witness in an earlier investigation so tainted the instant case as to require a dismissal." Filiberto Montoya was sentenced to forty-one months of incarceration and three years of supervised release. The court suspended Rosario Montoya's two-year sentence and placed her on three years of supervised probation. The Montoyas timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III.

### STANDARD OF REVIEW

"We review under the clearly erroneous standard the district court's finding that the government's evidence was untainted by a grant of immunity." *United States v. Lipkis*, 770 F.2d 1447, 1450 (9th Cir.1985). The district court's denial of a motion for an evidentiary hearing is reviewed for an abuse of discretion. *See United States v. Navarro–Garcia*, 926 F.2d 818, 822 (9th Cir.1991). The standard of review for vindictive prosecution is unsettled in the Ninth Circuit. The court has variously applied abuse of discretion, clearly erroneous, and *de novo* standards. *See United States v. Garza–Juarez*, 992 F.2d 896, 903 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). The district court's refusal to dismiss the indictments on the basis that the government's conduct was not outrageous is reviewed *de novo*. *United States v. Solorio*, 37 F.3d 454, 457 (9th Cir.1994).

## IV.

### DISCUSSION

#### A. Immunized Testimony

The Montoyas argue that this prosecution is tainted because of improper use of Filiberto Montoya's immunized statements and testimony in violation of his Fifth Amendment right against self-incrimination.[4] *See Kasti-*

---

3. On February 8, 1993, the Government filed a superseding information against Rosario Montoya, to which she entered a conditional plea of guilty.

4. The Government argues that Rosario Montoya lacks standing to appeal on the basis of her husband's assertion of constitutional rights. However, the Government has specifically agreed that should Filiberto Montoya prevail in his arguments that his immunity was breached,

gar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In *Kastigar*, the Supreme Court upheld the constitutionality of the federal witness use immunity statute, 18 U.S.C. § 6002, and held that a prosecution of a previously immunized witness is allowable, but emphasized that "[t]he statute provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom." *Id.* at 460, 92 S.Ct. at 1664; *see also id.* at 453, 92 S.Ct. at 1661.

 The use immunity statute provides in relevant part that:

> [N]o testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

18 U.S.C. § 6002. The statute thus provides use and derivative use immunity, which "grants immunity from the use of the compelled testimony and evidence derived therefrom." [5] *Block v. Consino*, 535 F.2d 1165, 1167 n. 3 (9th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976). "[S]uch immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination." *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661. "The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted." *Id.* "Use immunity does not protect the substance of compelled testimony, it only protects against the use of compulsory testimony as a source of evidence." *United States v. Crowson*, 828 F.2d 1427, 1428–29 (9th Cir.1987) (internal quotation omitted), *cert. denied*, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988).

 A person compelled to testify against himself under a grant of immunity need only show that he testified in order "to shift to the government 'the heavy burden' of proving an independent source for all its evidence." *United States v. Mapelli*, 971 F.2d 284, 288 (9th Cir.1992) (citing *Kastigar*, 406 U.S. at 461, 92 S.Ct. at 1665). "This burden of proof ... is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 461, 92 S.Ct. at 1665; *see also United States v. Koon*, 34 F.3d 1416, 1432 (9th Cir.1994); *Crowson*, 828 F.2d at 1429. "[A] good faith allegation that the evidence is not the fruit of the immunized testimony is not sufficient; the Government must show how it acquired all of the evidence." *Block*, 535 F.2d at 1169. "The government must prove the independent source by a preponderance of the evidence, and we will uphold a district court's findings unless clearly erroneous. This court has permitted the government to meet its burden of proof as to the existence of independent, prior sources through affidavits." *Crowson*, 828 F.2d at 1429 (citation omitted).[6]

 "[T]here is no *per se* rule requiring the withdrawal of a prosecutor or other government official who may have been exposed to immunized testimony." *Id.* at 1430; *see also Mapelli*, 971 F.2d at 287. If the prosecution team has been exposed to the immunized testimony, the Government may still use the evidence if it meets its burden of proof that the evidence is derived from independent sources. *Crowson*, 828 F.2d at 1430; *Mapelli*, 971 F.2d at 287–88. The question "is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant." *Crow-*

that Rosario will also receive a dismissal. Therefore, we need not address the standing argument.

**5.** Transactional immunity, on the other hand, "is full immunity from prosecution for any offense to which the testimony relates." *United States v. Plummer*, 941 F.2d 799, 803 (9th Cir.1991).

**6.** As the Court of Appeals for the District of Columbia has observed, "the *Kastigar* burden is

'heavy' not because of the evidentiary standard, but because of the constitutional standard: the government has to meet its proof only by a preponderance of the evidence, but *any* failure to meet that standard must result in exclusion of the testimony." *United States v. North*, 910 F.2d 843, 873, *modified*, 920 F.2d 940 (D.C.Cir.1990) (en banc), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

*son,* 828 F.2d at 1430 (internal quotation omitted). The Government may protect "against a claim of indirect use by assigning the case to others not exposed and barring communication between them and the prosecutors who obtained the compelled testimony." *Mapelli,* 971 F.2d at 288; *see also Crowson,* 828 F.2d at 1429–30.

### 1. Alleged evidentiary use of the immunized statements and testimony.

■ The district court found that the Government obtained the evidence used to indict Montoya from independent sources. Contrary to the Montoyas' portrayal of the district court's order, the district court did find there was some overlap between the Reese and the Weiner investigations. As the district court correctly observed, however, the Government is not required to show that there was no overlap, but that "all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar,* 406 U.S. at 461–62, 92 S.Ct. at 1665; *see also Koon,* 34 F.3d at 1432. Simply arguing that the investigations overlapped does not answer the question of the existence of legitimate independent sources for all of the evidence. Montoya's attack on the declarations of Agent Roman Chavez, Agent David Gauthier, and AUSA Reese therefore misses the mark. *Even if* agents and prosecutors actually participated in both investigations, and/or were exposed to immunized testimony, there is no *per se* rule requiring their withdrawal from the case. *Crowson,* 828 F.2d at 1430. The focus of the inquiry under *Kastigar* is whether the immunized testimony was in any way used to build a case against Montoya. *Id.* With this focus in mind, we address the Montoyas' specific complaints concerning the Government's attempt to meet its burden of proof in this case.

#### a. Agent Chavez's declaration.

Agent Chavez was involved in the Reese investigation, and his declaration describes the execution of the search warrants of Montoya's properties in May and August 1988 (before Montoya was first interviewed in November 1988). As the district court observed, Chavez recited in great detail the documents and leads found as a result of these searches, as well as the resulting subpoenas issued to financial institutions. Contrary to Montoya's characterization, nowhere does Chavez state in his declaration that he was involved in both the Reese and Weiner investigations.[7] While Chavez investigated the purchase and acquisition of the properties with which the Montoya prosecution was concerned, it was done as part of the Contreras prosecution, and the evidence and resulting leads were obtained before Montoya was first interviewed.

Chavez states in his declaration that "the majority of financial leads that I pursued had already been obtained prior to any contact with Filiberto Montoya." Chavez provides a detailed time-line for each step he took in the investigation. He lists seven investigatory actions (interviews, conversations and issuance of a subpoena) taken after the November 18, 1988, interview of Montoya, but ties each one to a lead obtained well before that date.

■ While Chavez's declaration does contain the conclusory statement that "[a]t no time did I ever use any information provided by Filiberto Montoya in pursuing leads associated with the Contreras–Subias investigation," it also contains much more than this: a detailed time-line and tracing of the investigation, based on information and leads obtained in the search warrants executed before Montoya received informal immunity. Montoya's attack on this declaration does not address the detailed independent sources of information obtained in Chavez's investiga-

---

7. Counsel for Rosario Montoya stated at oral argument that Agent Chavez participated in both investigations. In their motion to dismiss the indictment, the Montoyas noted that Agent Chavez is listed on the "case initiation" as an agent involved in the Weiner investigation. Even if we assume that Agent Chavez was involved in both investigations, his declaration ties all of his inves-

tigative leads back to a time prior to the first interview of Montoya. Furthermore, it also details how Chavez segregated and sealed all documents "having anything to do with interviews with Filiberto Montoya conducted by the case agent" prior to his turning the case file over to Agent Young of the Weiner investigation team in October 1990.

tion. Chavez's declaration was not "limited to a negation of taint." *See Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1665.

#### b. Agent Gauthier's declaration.

As the district court specifically noted in its synopsis of the declarations, Agent Gauthier was involved in the Reese investigation, but also later accompanied Agent Morris of the Weiner investigation team when she interviewed witnesses involved in the real property transactions. The Montoyas contend that this demonstrates "overlap" and therefore establishes taint. However, Gauthier's declaration states that he "never interviewed Montoya or his wife," "never reviewed or discussed any reports of [the] interview of Montoya or transcripts of his testimony," and had not had anyone "impart[ ] to [him] any information purportedly derived from Montoya's statements." Furthermore, Gauthier explained his motivation to accompany Agent Morris as follows:

> In July and November 1989 I accompanied Agent Linda Morris in a number of interviews of witnesses involved in certain real estate transactions she was investigating. Agent Morris did most of the questioning. I was motivated to accompany her by the hope that I could obtain information concerning drug trafficking suspects whose whereabouts remained unknown to us at the time.

Agent Morris explained in her declaration that sometime after May 19, 1989, she told Agent Gauthier of her findings involving the Montoyas and two businesses, and Gauthier informed her that in August 1988, search warrants had been served on the businesses and two properties belonging to Montoya. Gauthier did not mention that Montoya had been interviewed. Morris confirmed that she and Gauthier interviewed a number of people identified with the property transactions in question, but also stated that she had "never been given any information by anyone concerning Montoya's interviews and testimony." [8]

Agent Gauthier was never exposed to Montoya's immunized testimony. The fact that this Reese investigation team member attended a number of witness interviews with a member of the Weiner investigation team does not demonstrate that the immunized testimony was in any way used to build a case against Montoya. *See Crowson*, 828 F.2d at 1430.

#### c. The Reese declaration.

The Montoyas argue that AUSA Reese's declaration reveals that even after Montoya's testimony at the Oklahoma trial, Reese continued his investigation of Montoya by calling Roberto Guerra before the grand jury and questioning him regarding a Tuscon real estate deal involving Montoya. They then take issue with Reese's declaration statements that he "did not rely on any information [he] obtained from Montoya to compose questions to Guerra," but instead used an investigative report reflecting interviews conducted by Agents Gauthier and Morris.

Guerra was called before the grand jury not as part of an investigation of Montoya, but during the course of an additional investigation of the Contreras drug organization. A superseding indictment in the Contreras case was returned thereafter in September 1989. Independent investigation had disclosed that Guerra, who was an acquaintance of Montoya, was the nominal purchaser of the Arizona property, but that the beneficial owner was a Contreras. Montoya advances nothing but the most tangential link between the questioning of Guerra in the Contreras–Subias investigation and the thought processes of Reese during the questioning. More importantly, these facts do not give rise to taint or reveal a lack of an independent source for all of the Government's evidence against the Montoyas.

Montoya next attacks Reese's failure to follow Department of Justice guidelines concerning the preservation of the ability to indict an immunized witness. He cites the

---

8. According to the declaration of AUSA Reese, at some point near the end of 1989, Reese informed Morris that "it was essential that the case [against Montoya] be based on evidence obtained totally independently of any information obtained from Montoya himself," in light of his immunized status.

failure to prepare a signed and dated memo summarizing the evidence concerning Montoya prior to his interview and testimony; the failure to ensure all of his testimony was recorded verbatim and maintained in a secure, restricted access location; and failure to maintain a record of subsequently received evidence against him.

■ However, failure to strictly comply with the United States Attorneys' Manual creates no enforceable rights. *United States v. Lorenzo*, 995 F.2d 1448, 1453 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 225, 126 L.Ed.2d 180 (1993). The lack of a memorandum of evidence available to charge Montoya as of November 17, 1988, made more work for the Government in this case; however, it was still able to create an adequate history of what information was obtained through which of the various sources and at what time. The Government showed the Weiner prosecution team was aware of the immunity problem and followed reliable procedures for segregating the immunized testimony.[9]

### d. Conclusion.

■ The district court made the proper inquiry in this case, and we find no clear error in its findings that the government proved independent sources for all of its evidence against Montoya. The Montoyas' focus on "overlap" and alleged exposure to immunized testimony does not answer the question that we must ask in deciding this appeal. The nine detailed declarations filed by the Government establish that the indictment rested entirely on sources independent of Montoya's immunized testimony. We are satisfied that the district court's finding that there was no evidentiary use of Montoya's immunized statements and testimony was not clearly erroneous.

### 2. Alleged non-evidentiary use of the immunized statements and testimony.

Montoya argues that the most glaring use of his immunized testimony was the non-evidentiary use of it in deciding to prosecute him and his wife. First, he argues that Reese used Montoya's immunized testimony in his application for permission to prosecute Montoya. Next, he argues this taint was compounded when AUSA Meza saw this application. Finally, Montoya points to a report/document "either prepared by or definitely used by" AUSA Weiner in the prosecution of the Montoyas, which states that Reese had been "convinced that Montoya was not being truthful and Mr. Reese submitted his request to prosecute Montoya to the Attorney General ... [who later] approved the prosecution."

■ Non-evidentiary use of immunized testimony could include the decision to prosecute an immunized witness. *Crowson*, 828 F.2d at 1430. *Kastigar* did not expressly discuss the propriety of non-evidentiary use. *See Kastigar*, 406 U.S. at 453, 460, 92 S.Ct. at 1661, 1664–65. In *Crowson*, we assumed that non-evidentiary use was prohibited. *Crowson*, 828 F.2d at 1430 ("A more difficult question is what proof or procedures the government must employ to carry its burden of showing that it made no *non-evidentiary* use of the immunized testimony."). *Compare United States v. North*, 910 F.2d 843, 856 (assuming without deciding that a prosecutor cannot make non-evidentiary use of immunized testimony), *modified*, 920 F.2d 940 (D.C.Cir.1990) (en banc), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *and United States v. Byrd*, 765 F.2d 1524, 1531 (11th Cir.1985) ("It is our view that the privilege against self-incrimination is concerned with direct and indirect *evidentiary* uses of compelled testimony and not with the exercise of prosecutorial discretion."). *Crowson* did not answer the question of whether or not the Government meets its burden of showing no non-evidentiary use by establishing prior, independent sources for all of the evidence because there were "other indications that the government did not indi-

---

**9.** The transcripts of Montoya's grand jury and trial testimony were not made available to the Weiner team investigators. The transcripts and reports of interviews with Montoya after immunity was conferred were collected and sealed. A different Assistant United States Attorney was assigned to prosecute the case so that he would be isolated from the immunized testimony and the interviews with Montoya.

rectly use [the immunized] testimony for non-evidentiary purposes despite its admitted access to that testimony." *Crowson,* 828 F.2d at 1431.

As pointed out above, this circuit has not specifically decided whether non-evidentiary use comes within the prohibition of the statute. We need not decide that general issue in this case, either, but will assume that some non-evidentiary uses could come within the ban of the statute.

Section 6002 does not prohibit all use of immunized testimony. It proscribes its direct or indirect use *against* the witness. 18 U.S.C. § 6002.

■ Montoya's claimed relationship between his immunized testimony and the decision to prosecute is too tenuous and remote. AUSA Reese was not preparing the indictment, he was seeking the approval of the Attorney General to prosecute Montoya. Reese was following internal procedures which required him to submit a request for authorization to prosecute and to obtain the express written authorization of the Attorney General before prosecution could be initiated. *See* United States Attorneys' Manual, Title 9, Section 23,400 (1990). As part of the departmental policy, Reese was to submit a memorandum indicating:

> (a) the unusual circumstances which justify prosecution, (b) the method by which he/she will affirmatively establish either that all evidence necessary for a conviction was in the hands of the government prior to the date of the defendant's compelled testimony or that it came from sources independent of the witness's testimony and was not the result of focusing an investigation on the witness because of compelled disclosures, and (c) how he/she will show affirmatively that no other "non-evidentiary" use has been or will be made of the compelled testimony in connection with the proposed prosecution (for example, by having the prosecution handled by an attorney unfamiliar with the substance of the compelled testimony).

*Id.* Assistant United States Attorneys are instructed that,

> [i]n weighing the public interest in prosecuting a person for an offense first disclosed in, or closely related to, his/her compelled testimony, the attorney for the government should take into account, *inter alia,* the importance of encouraging free and full disclosure by witnesses whose testimony is compelled. He/she should also take into account the extent to which the potential defendant had testified freely and fully in compliance with the order.... [L]ess than complete testimony should not appear to be rewarded by a declination of prosecution in a case where independent evidence clearly exists and the situation otherwise warrants prosecution.

*Id.*

Reese's application for permission to prosecute Montoya does not contain a summary or complete overview of Montoya's grand jury or trial testimony. It does not detail the real estate transactions that were later used in the instant indictment. Rather, the application describes two incidents involving Montoya's testimony which led the Government to believe Montoya was not being completely cooperative or candid. First, before the grand jury Montoya initially denied knowledge concerning the leader of the drug organization. The memorandum then details why it was believed that Montoya deliberately withheld information about his acquaintance with the drug ring leader, thus prompting the suspicion that Montoya would tell the Government only what he believed was already known. Second, while testifying at the Oklahoma trial, Montoya effectively denied knowledge of certain summaries of expenses of the properties which had been found during the course of the investigation. Apparently, Montoya had previously given the Government more information about the realities underlying preparation of the summaries, which tended to demonstrate management and control of the properties by the Contreras family, rather than the nominal owners. Reese characterized Montoya's trial testimony as thus becoming "essentially neutral."

■ This information was clearly included to demonstrate why prosecution of Montoya was justified. Reese explained that "[i]n sum, it appears that immunity has not en-

couraged complete testimony from Montoya and he should not be rewarded by declining prosecution where independent evidence exists, and the situation otherwise warrants prosecution." While this memorandum does contain a one paragraph, basic overview of the Montoyas' scheme, the memo then goes on to detail the independent sources of evidence necessary to prosecute Montoya.

As the DOJ instructions point out, there is a public interest component to the decision to prosecute an immunized witness. The Government is interested in "encouraging free and full disclosure." Thus, the AUSA is exhorted to consider "the extent to which the potential defendant had testified freely and fully in compliance with the order." But after considering these factors, "less than complete testimony should not appear to be rewarded...."

The requirement of a showing to the Attorney General that sufficient independent evidence exists to support a prosecution addresses the question of whether a witness *could* be successfully prosecuted. Absent some analysis of the witness's actual testimony and how it squares with what the Government knew of the ability of the witness to say more, there would be no analysis of whether there *should* be a prosecution. In addition to constraining the Attorney General's exercise of her discretion, a rule that foreclosed her consideration of whether a prosecution *should* take place would not be in the best interest of immunized witnesses in general, and contrary to the public interest identified in the DOJ manual.

Reese needed to communicate to his superiors the unusual circumstances justifying prosecution. *Cf. Byrd,* 765 F.2d at 1530 ("*Kastigar* made no mention of any burden on the government to erect an impenetrable barrier between the prosecutors who hear or read the immunized testimony and those who decide to indict, even though the potential problem was an obvious one."). This could not be done by simply reciting the nontestimonial evidence against Montoya. We conclude that Reese's involvement in requesting permission to prosecute was too remote from the criminal proceeding against Montoya to constitute non-evidentiary use of the immunized testimony against him.

 The fact that AUSA Meza read the application for permission to prosecute, even if it had contained an actual summary of Montoya's testimony, would not mean she would have had to withdraw from participation in the case. *See Crowson,* 828 F.2d at 1430. Nor does it demonstrate anything other than a remote and tenuous connection to the decision to initiate a prosecution against Montoya. That Meza read the application does not demonstrate that the Government made non-evidentiary use of Montoya's immunized testimony.

 The report prepared or relied upon by AUSA Weiner, describing how Reese was convinced Montoya was not being truthful, did not involve improper use of immunized testimony. As the district court pointed out, the various reports in the Montoya case "are just reiterating a generalized opinion that the Government believed Montoya lied to the grand jury." This does not in any way indicate that Weiner had access to the contents of Montoya's statements and testimony. Without significant exposure, Meza and Weiner "could not have made significant non-evidentiary use, permissible or impermissible." *See North,* 910 F.2d at 860.

### B. The Denial of a Kastigar Hearing

The Montoyas argue alternatively that if their indictments are not dismissed on the basis of improper use of immunized testimony, or because of vindictive prosecution or outrageous government conduct (discussed below), their case should be remanded for a full *Kastigar* hearing. They contend that the district court's refusal to grant a *Kastigar* hearing involving cross-examination of the Government's declarants deprived them of their right to procedural due process and their right to confront the witnesses against them. After considering the additional discovery material provided by the Montoyas, the district court stated:

> Nowhere in the voluminous documents submitted to the court are there implications that the declarants, which swore they had no knowledge of Montoya's statement

or testimony, knew the content of Montoya's statements or testimony. *Importantly, absent such a contradiction, there is no need for an evidentiary hearing.*

■ While ordinarily the district court should hold a *Kastigar* evidentiary hearing, *see Trimiew v. United States,* 9 F.3d 1388, 1390 (9th Cir.1993), the Government may meet its *Kastigar* burden of proof as to the existence of independent, prior sources through affidavits. *Crowson,* 828 F.2d at 1429 (citing *United States v. Rogers,* 722 F.2d 557, 560 (9th Cir.1983) ("exhaustive" sworn declarations), *cert. denied,* 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984)).

In *United States v. Zielezinski,* 740 F.2d 727, 734 (9th Cir.1984), we held that when the same grand jury that hears a person's immunized testimony then indicts the person, a *Kastigar* -style hearing is necessary to determine the independent grounds for the indictment. "Even if proper, such an indictment *appears* tainted." *Lipkis,* 770 F.2d at 1451 (citing *Zielezinski,* 740 F.2d at 733). On the other hand, in *Lipkis,* we held that a *Kastigar* hearing was not compelled once the defendant stipulated that there were only minimal differences between his nonimmunized and immunized statements. We held that "a subsequent hearing would have served no purpose" and "was unnecessary because no issues were left to resolve." *Id.*

Although the Montoyas cite *Zielezinski* for the proposition that a *Kastigar* hearing is mandated, their case differs factually because Filiberto Montoya was not indicted by the same grand jury that heard his immunized testimony.[10] Furthermore, while Montoya did not make the kind of stipulation the defendant did in *Lipkis,* in this case we agree with the district court that a hearing was unnecessary because no issues were left to resolve. The declarations filed by the Government were exhaustive, detailed, nonconclusory in form, and uncontradicted. They did not simply ask the court to rely on the Government's good faith. *See Block,* 535 F.2d at 1169.

The Montoyas argue that the declarations served only to put issues in dispute and did not avoid, but rather required, an evidentiary hearing. The Montoyas contend that a hearing is necessary to resolve various alleged inconsistencies and misleading and inaccurate statements in the declarations. However, their attempt to create inconsistencies misses the mark.

First, they contend AUSA Meza states in her declaration that she had not been exposed to any of Montoya's statements or immunized testimony, while also admitting that she saw a copy of the request for authority to prosecute Montoya. Meza in fact stated in her declaration that "[a]lthough I saw a copy of the U.S. Attorney's request for authority to prosecute Montoya, I have never seen transcripts of Montoya's testimony or reports of his interviews." As we have described, Meza's exposure to the request for authority to prosecute would not require her to withdraw from the case, did not constitute non-evidentiary use, and likewise does not necessitate a *Kastigar* hearing. The Montoyas'. contentions with regard to the Meza declaration do not raise an issue of fact warranting a *Kastigar* hearing.

Second, the Montoyas contend that AUSA Weiner was in possession of at least one report which referenced and discussed Montoya's testimony, in conflict with Weiner's statement in his declaration that he had "carefully reviewed the materials that Ms. Meza had assembled in connection with the investigation and determined that none of these materials included any reference to prior testimony or prior interviews with Filiberto E. Montoya." However, the one example of such a report that the Montoyas point to on appeal, entitled "Filberto Montoya–Esparaza Real Estate Investigation," does not discuss Montoya's immunized testimony.

10. The Montoyas also cite *United States v. North,* 920 F.2d 940, 943 (D.C.Cir.1990) (en banc) ("*North* II"), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), in support of their argument that they were entitled to a hearing. In *North II,* the court stated that "[m]ost important, the defendant is entitled to a *hearing* at which he would be able to challenge the prosecution's case for non-use." *Id.,* 920 F.2d at 943. The situation in *North* was unique in that the defendant's immunized testimony before Congress was televised and therefore potentially exposed to all of the witnesses for North's subsequent criminal trial.

The closest it comes to the immunized testimony is the reference to the fact that in the Contreras–Subias investigation, Reese "was convinced that Montoya was not being truthful."

The Government conceded in its brief that the Reese report (the application for permission to prosecute) was in the Weiner team materials. While Meza's declaration states that she read the application, Weiner's declaration does not specifically address whether or not he read the application.[11] Even if Weiner, or members of his investigation team, were exposed to the application, as we have explained, given the content of the application, it would not constitute significant exposure such that it constituted non-evidentiary use.

Finally, the Montoyas contend that had the district court granted an evidentiary hearing and cross-examination, it would have learned that Reese assisted the other eight declarants in preparing their declarations. Reese explained at an earlier hearing before a magistrate judge that he managed the collection of the declarations and did make some suggestions as to form and content. To the extent that the Montoyas suggest that the Government's declarations were therefore contrived, false, or even tainted, we reject the argument. Reese's involvement in the preparation and collection of the declarations did not necessitate the cross-examination of the other eight declarants.

■■■■■ In this case, the district court's careful review of all of the declarations and discovery documents complied with due process, and the refusal to allow cross-examination was an appropriate exercise of judicial discretion. The alleged internal inconsistencies in the declarations do not call into question the Government's proof by a preponderance of the evidence that all evidence utilized in the indictment of the Montoyas was obtained from independent sources and that the Weiner prosecution team had no access to the immunized testimony.

11. Weiner's declaration states that he "carefully reviewed the materials that Ms. Meza had assembled in connection with the investigation and

## C. Vindictive Prosecution and Outrageous Government Conduct

The Montoyas also contend that the district court should have dismissed the indictment because it was based on outrageous government conduct and vindictive prosecution due to the Government's dissatisfaction with Filiberto Montoya's immunized testimony. We disagree.

■■■■■ "To establish a prima facie case of prosecutorial vindictiveness, a defendant must show either direct evidence of actual vindictiveness or facts that warrant an appearance of such." United States v. Sinigaglio, 942 F.2d 581, 584 (9th Cir.1991). "Evidence indicating a realistic or reasonable likelihood of vindictiveness may give rise to a presumption of vindictiveness on the government's part." Garza–Juarez, 992 F.2d at 906. However, the Supreme Court has emphasized that this presumption must be supported, because at the pretrial stage, " 'the prosecutor's assessment of the proper extent of prosecution may not have crystallized.' " Id. (quoting United States v. Goodwin, 457 U.S. 368, 381, 102 S.Ct. 2485, 2493, 73 L.Ed.2d 74 (1982)). Once a presumption of vindictiveness has arisen, the burden shifts to the prosecution to show that "independent reasons or intervening circumstances dispel the appearance of vindictiveness and justify its decisions." United States v. Hooton, 662 F.2d 628, 634 (9th Cir.1981), cert. denied, 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982); see also Garza–Juarez, 992 F.2d at 906.

■■■■■ While most vindictive prosecution cases involve re-indictment of a defendant, the mere filing of an indictment can support a charge of vindictive prosecution. Hooton, 662 F.2d at 634. However, the Montoyas must still prove an improper prosecutorial motive through objective evidence before any presumption of vindictiveness attaches. See Goodwin, 457 U.S. at 380 n. 12, 102 S.Ct. at 2492 n. 12. Despite the fact that they were provided with numerous internal government documents, they were unable to prove improper motive.

determined that none of these materials included any reference to prior testimony or prior interviews with Filiberto E. Montoya."

As previously mentioned, the standard of review for claims of vindictive prosecution is unsettled in this circuit. *See Garza–Juarez*, 992 F.2d at 903. Even under the *de novo* standard of review, however, we conclude that the presumption of vindictiveness did not arise in this case. *See Goodwin*, 457 U.S. at 380 n. 12, 102 S.Ct. at 2492 n. 12; *Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) ("Nor does the prosecutorial practice of threatening a defendant with increased charges if he does not plead guilty, and following through on that threat if the defendant insists on his right to stand trial, create a presumption of vindictive prosecution." (internal quotation and citation omitted)); *cf. Garza–Juarez*, 992 F.2d at 907 (presumption arose, but was rebutted).

Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed. *See Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). Under the "extremely high standard" of this doctrine, an indictment should be dismissed "only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *Garza–Juarez*, 992 F.2d at 904 (internal quotation omitted); *see also Solorio*, 37 F.3d at 458.

Other than a reference to "outrageous governmental conduct" in a heading in their opening brief, the Montoyas do not develop this argument until their reply brief. In their reply brief, the Montoyas argue that the indictment of Rosario Montoya is a "vindictive outrage," based on a letter to Filiberto Montoya from AUSA Weiner. The letter stated that "[t]he government would be willing to accept a plea of guilty to one or more specific charges by Filiberto Montoya in return for a conclusion to the government's

investigation and no charges being brought" against his wife.

Issues not "specifically and distinctly raised and argued" in the opening brief need not be considered by the court. *Officers for Justice v. Civil Serv. Comm'n*, 979 F.2d 721, 726 (9th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993). While we decline to consider the argument in any detail, there is no evidence in this case that would satisfy the "extremely high" burden to establish a claim of outrageous government conduct.

## V.

## CONCLUSION

There was no error in the district court's refusal to dismiss the indictments. The Government met its burden of proof under *Kastigar* and this court's precedent. There was no evidentiary or non-evidentiary use, direct or indirect, of Filiberto Montoya's immunized testimony. The claim of prosecutorial vindictiveness as a basis for dismissing the indictments fails. We decline to remand the case for a full evidentiary hearing and cross-examination of the nine declarants because under the circumstances of this case, the Government met its *Kastigar* burden of proof without the necessity of a full hearing. We have considered all of the contentions advanced by the parties and conclude that no further discussion is necessary. The convictions of Filiberto E. Montoya and Rosario Montoya are affirmed.

AFFIRMED.

BRIGHT, Senior Circuit Judge, dissenting.

I respectfully dissent from the majority's opinion which affirms the convictions of Filiberto E. and Rosario Montoya. The majority mistakenly rejects the Montoyas' arguments that this prosecution is tainted because of improper use of Filiberto Montoya's immunized testimony and that the indictment was based on vindictive prosecution.[1]

---

1. Technically, Rosario Montoya does not qualify for fifth amendment relief, as she gave no immunized testimony. The Government, however, agrees that her appeal shall be governed by the resolution on her husband's fifth amendment claims. Thus, we refer to both Montoyas as making the same claims.

## Non-evidentiary Use of Immunized Testimony

In this case, the crucial issue is whether the Government has demonstrated that it did not use the immunized testimony, directly or indirectly, in prosecution of the Montoyas, as required by *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and the precise wording of the applicable statute.[2] Here, the Government has failed to meet its burden of proof under *Kastigar* and this court's precedent. To the contrary, the evidence indicates that AUSA Reese, the original prosecutor, used Filiberto Montoya's immunized testimony before the grand jury in January 1989 to compare it to prior information contained in the investigation report and also to Montoya's testimony at the Oklahoma trial in May 1989.

As a result of the comparison, AUSA Reese concluded that Filiberto Montoya had testified untruthfully before the grand jury and in Oklahoma. Rather than prosecuting Montoya for perjury, AUSA Reese initiated the steps leading to the prosecution of the Montoyas for the crimes of which they were ultimately convicted. AUSA Reese's recommendations were set forth in the memorandum to the United States Attorney requesting permission from the Department of Justice to prosecute Montoya for conspiracy to commit bank and mail fraud and money laundering, in addition to the substantive offenses. AUSA Meza and AUSA Weiner, the subsequent prosecutor, were exposed to this recommendation. The prosecutors improperly used Filiberto Montoya's immunized testimony to initiate a case against the Montoyas.

The crucial question before us is whether the Government indirectly used Filiberto Montoya's immunized testimony to indict the Montoyas? The decision to initiate prosecution of an immunized witness may be considered non-evidentiary use of immunized testimony. *United States v. Crowson*, 828 F.2d 1427, 1430 (9th Cir.1987) (citing *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir.1973)).[3]

As construed by the Supreme Court, 18 U.S.C. § 6002 "provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom ..." *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1664. "This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Id.*

The record indicates that AUSA Reese used Filiberto Montoya's immunized testimony as an investigatory lead in deciding to initiate prosecution of the Montoyas which is explicitly prohibited by *Kastigar*. The investigatory lead is a significant use of the immunized testimony. Even if the Government had evidence derived from legitimate independent source, the Government significantly used Filiberto Montoya's immunized testimony in deciding to initiate prosecution.

The Government, however, failed to show that its decision to initiate prosecution did not rely on AUSA Reese's conclusion that Mr. Montoya should be prosecuted because of his failure to fully cooperate during the grand jury investigation and at the Oklahoma trial. The record indicates that AUSA Reese resorted to using Montoya's immunized grand jury and trial testimony to decide that

---

2. 18 U.S.C. § 6002 reads, in part:

> Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
> (1) a court or grand jury of the United States,

> . . . . .

> and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; *but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.*
> 18 U.S.C. § 6002 (emphasis added).

3. The *Crowson* court recognized that *United States v. Byrd*, 765 F.2d 1524 (11th Cir.1985), suggests the contrary where the immunized testimony does not enter into the subsequent trial.

the prosecution ought to go forward, rather than initiating a prosecution of Mr. Montoya for perjury which is permissible under the statute.

The Government initially possessed information regarding Montoya's connection to the Contreras family. Therefore, the Government did not need to grant Filiberto Montoya use immunity to obtain evidence of his participation in alleged criminal activity. The AUSA sought Montoya's assistance in arresting and convicting the alleged drug smuggler, Jose Leonardo Contreras–Subias. The Government then granted Montoya use immunity in order to proceed with its case against the Contreras–Subias organization. As the record shows, AUSA Reese became dissatisfied with Montoya's immunized testimony before the grand jury and at trial. Of course, AUSA Reese became dissatisfied with Montoya's testimony only by an examination of and comparison to the immunized testimony with other evidence. AUSA Reese's comparisons and recommendation to prosecute the Montoyas based on the immunized testimony tainted the entire prosecution of the Montoyas in violation of their fifth amendment right against self-incrimination.

The district court and the majority opinion fail to recognize this important use of the immunized testimony and mistakenly conclude that AUSA Reese's involvement was too remote from the criminal proceeding against Mr. Montoya to constitute non-evidentiary use of the immunized testimony. The majority opinion seems to adopt the rule that as long as the new prosecution relies on independent evidence that the Government previously possessed, the Government may use immunized testimony against an immunized defendant.

Neither *Crowson* nor *United States v. Byrd,* 765 F.2d 1524 (11th Cir.1985), answer the precise question before us. This court, in *Crowson,* stated:

> We believe the government's burden of showing that its evidentiary use of the immunized testimony was proper should not change merely because members of the prosecution team had access to the testimony. 'The focus of the inquiry under *Kastigar* ... is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to *build a case* against the defendant.' [*United States v.*] *Caporale,* 806 F.2d [1487] at 1518 [ (11th Cir.1986) ].
>
> A more difficult question is what proof or procedures the government must employ to carry its burden of showing that it made no non-evidentiary use of the immunized testimony. 'Such [non-evidentiary] use could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy.' *McDaniel,* 482 F.2d at 311.

*Crowson,* 828 F.2d at 1430 (emphasis added). The *Crowson* court concluded:

> The government has established a prior, independent source for all of the evidence introduced before 'the second' grand jury and at trial. Even assuming that this is insufficient to meet the government's burden of showing that there was no non-evidentiary use of Crowson's immunized testimony, we feel that there are other indications that the government *did not indirectly use* his testimony for non-evidentiary purposes despite its admitted access to that testimony.

*Id.* at 1431 (emphasis added). The emphasized statements above cannot be made here where AUSA Reese used and relied on the immunized testimony for bringing on the case.

In *Byrd,* the court recognized the "difficult question" whether *Kastigar* "prohibits any use of immunized testimony for [a] non-evidentiary purpose[.]" *Byrd,* 765 F.2d at 1528–29. The court answered that question in the negative as a case of first impression in that circuit. I reject *Byrd* as inconsistent with the language of *Kastigar* and the unambiguous wording of the statute.[4]

---

4. *United States v. Byrd,* 765 F.2d 1524, 1531–32 (11th Cir.1985) (interpreting *Kastigar* as not requiring a court to inquire into a prosecutor's motives in seeking indictment and limiting the privilege against self-incrimination to protect only direct and indirect evidentiary uses of compelled testimony). This writer believes the language in *Byrd* is directly contrary to *Kastigar.*

## Vindictive Prosecution

A prima facie case of prosecutorial vindictiveness is established if a defendant shows either direct evidence of actual vindictiveness or facts that warrant an appearance of prosecutorial vindictiveness. *United States v. Sinigaglio*, 942 F.2d 581, 584 (9th Cir.1991). Evidence indicating a realistic or reasonable likelihood of vindictiveness may give rise to a presumption of prosecutorial vindictiveness. *United States v. Garza–Juarez*, 992 F.2d 896, 906 (9th Cir.1993). The majority concludes that the Montoyas were unable to prove improper prosecutorial motive which would give rise to a presumption of vindictiveness. I, however, disagree.

In order to decide to initiate prosecution of the Montoyas, AUSA Reese compared the investigatory records, including Montoya's immunized testimony, to determine whether Mr. Montoya testified falsely. After AUSA Reese determined, in his mind, that Montoya testified falsely, AUSA Reese could either prosecute Montoya for perjury, which he was apparently unwilling to do, or proceed against Montoya in another manner.

AUSA Reese decided to use all of the information which was initially gathered to prosecute Montoya, without giving Montoya a chance to defend his immunized testimony. AUSA Reese was not willing to prosecute Montoya initially because he wanted Montoya to testify against targeted defendants. When AUSA Reese became dissatisfied with Montoya's testimony, AUSA Reese decided to initiate prosecution.

AUSA Reese, in sum, became judge and jury of Filiberto Montoya's conduct. AUSA Reese did not have enough proof to proceed with perjury charges so he obviously decided to punish Mr. Montoya with using the information the Government always had to prosecute him, and then, for extra measure, proceeding to recommend prosecution of Mrs. Montoya.

The flaw in this scheme is that the Government should have prosecuted Montoya initially, rather than granting him immunity. AUSA Reese, however, resorted to subterfuge. If Montoya lied, AUSA Reese, under the statute, could have initiated a prosecution for perjury. Instead, he turned Montoya's fifth amendment privilege against self-incrimination on its head, concluding that Montoya lied and AUSA Reese proceeded on a course to "fix" him.

I would not countenance that prosecutorial excessive zeal. To me, the evidence in the record indicates a realistic likelihood of personal pique and personal frustration which gives rise to a presumption of prosecutorial vindictiveness.

Accordingly, I would reverse the Montoyas' convictions.