65 F.3d 1461
 95 Cal. Daily Op. Serv. 7234, 95 Daily Journal
D.A.R. 12,341
UNITED STATES of America, Plaintiff-Appellee-Cross-Appellant,
v.
Lynn DUDDEN, Defendant-Appellant-Cross-Appellee.
 Nos. 93-30389, 93-30390.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 13, 1995.
Decided Sept. 13, 1995.
 
 Robert L. Stephens, Jr., Billings, MT, for defendant-appellant.
 James E. Seykora, Assistant United States Attorney, Billings, MT, for plaintiff-appellee.
 Appeal from the United States District Court for the District of Montana.
 Before: POOLE, BOOCHEVER, and WIGGINS, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 Lynn Dudden cooperated with federal authorities in their investigation of cocaine conspiracies in California and Montana. She was later indicted and convicted for conspiracy to distribute methamphetamine on one occasion, involving the same coconspirators who had been the target of the cocaine investigation. On appeal, she claims the district court should have dismissed the indictment because it was based on immunized statements she made to the federal agents. She also cites pre-indictment delay, outrageous government conduct, the district court's failure to give proposed instructions, limitations on cross-examination, and sentencing error. The government cross-appeals the district court's downward departure at sentencing.
 
 FACTS
 
 2
 In 1987, FBI Special Agent Carl Zarndt began an investigation into cocaine activities in Billings, Montana. In 1988, Agent Zarndt conducted a search of the Billings home of Raymond Jacobsen, and found an address book containing telephone numbers for appellant Lynn Dudden and her companion, Charles Hinck. The Montana investigation led to the 1988 arrest of Alton Butler, who cooperated with authorities and provided information against a number of people, including Jacobsen and Jim Fitzhugh. In addition to information about the cocaine conspiracy, in a July 1988 debriefing Butler told Zarndt that in February 1988 Butler flew to California, picked up methamphetamine from Jacobsen near San Jose, and drove it back to Jacobsen's residence in Billings.
 
 
 3
 During this time, Jacobsen and Fitzhugh also were under investigation in California for cocaine distribution. Dudden, then living in northern California, cooperated with federal authorities in the California investigation, detailing her own illegal activities related to cocaine distribution under an agreement that she would not be prosecuted based on any information she provided in her cooperation. FBI Special Agent Henry Brett was among the agents who spoke with Dudden. Fitzhugh was arrested in California in December of 1988 and tried for cocaine distribution. Fitzhugh's California trial resulted in a hung jury.
 
 
 4
 Dudden moved to Montana in late 1989. Agent Brett contacted her in March 1990 in connection with the investigation of Fitzhugh's cocaine activities in Montana, again assuring her that her statements would not subject her to prosecution. Agent Brett spoke with Dudden several times, summarizing their conversations in two FBI Form 302 interview reports. Dudden told Brett that she had transported cocaine to Fitzhugh twice.
 
 
 5
 Jacobsen and Fitzhugh were charged with conspiracy to distribute cocaine in Montana, based in part on Dudden's information. A superseding indictment dated April 20, 1990, included as an overt act the February 1988 delivery of methamphetamine that Butler had described in his 1988 debriefing. The indictment alleged that the profits were to be used to further the cocaine conspiracy.
 
 
 6
 Agent Zarndt contacted Dudden in July 1990. Although Agent Brett had told Agent Zarndt about Dudden, Agent Zarndt was unaware of any immunity agreement between Agent Brett and Dudden. Dudden told Agent Zarndt about Fitzhugh's cocaine involvement. Although she said she knew Jacobsen, she stated that she did not have first-hand information about Jacobsen's drug dealings. She added that she thought he was involved with methamphetamine.
 
 
 7
 In August 1990, Dudden went to the United States Attorney's office in Billings to be debriefed. Assistant United States Attorney ("AUSA") James Seykora had drafted a letter offering Dudden immunity for her testimony at Fitzhugh's and Jacobsen's upcoming trial for conspiracy to distribute cocaine in Montana. The letter was shown to Dudden at the meeting, but not given to her. Agent Zarndt, who was present at that interview, did not recall discussing the immunity letter with AUSA Seykora, but stated that it would be standard procedure to have discussed any immunity agreement with the prosecuting attorney. Dudden was never called to testify, because before trial Fitzhugh and Jacobsen pled guilty.
 
 
 8
 In March 1992, DEA Agent Gale Williams began an investigation of drug activity at Corporate Air, the employer of Dudden's companion, Charles Hinck. One of Agent William's sources mentioned Hinck. Agent Williams then conferred with AUSA Seykora and with Agent Zarndt, who steered him to FBI debriefings, including Butler's 1988 debriefing and Jacobsen's debriefing following his guilty plea in August 1990, which, like Butler's debriefing, detailed the February 1988 methamphetamine deal. Unlike Butler's statement, Jacobsen's debriefing named Hinck and Dudden.
 
 
 9
 Agent Williams interviewed Jacobsen in December 1992. Jacobsen told Williams that Dudden, who worked at the hotel where Jacobsen stayed near San Jose, had arranged for Jacobsen to meet Hinck and obtain the methamphetamine in February 1988. Agent Williams then conducted his own investigation, collecting telephone records, rental car information, tax returns, employment files, and utility bills. Some of the car rental records came from Agent Zarndt's 1990 investigation in which Dudden had cooperated. The records showed, among other things, calls from Jacobsen to Hinck's and Dudden's 1988 residence in Los Gatos, California, near San Jose.
 
 
 10
 In the process of his investigation, Agent Williams also reviewed Agents Brett's and Zarndt's Form 302s reporting their conversations with Dudden. Agent Williams testified that Dudden took on the stature of a coconspirator in his investigation based not on her Form 302s but on Jacobsen's 1990 debriefings. The only methamphetamine-related information in any of Dudden's Form 302s was her statement in July 1990 that she had the impression that Raymond Jacobsen was involved with methamphetamine. Agent Williams testified that he was not aware of any grant of immunity to Dudden until after the grand jury session.
 
 
 11
 Agent Williams participated in Dudden's and Hinck's arrest in February 1993. During the arrest, Dudden and Hinck were given a letter to the DEA from AUSA Seykora detailing the sentences they would face and the potential for reduction for substantial assistance in the DEA investigation of Corporate Air.
 
 
 12
 Dudden and Hinck did not cooperate in the Corporate Air investigation. They pled not guilty to an indictment charging them with one count of distribution of methamphetamine and one count of conspiracy to distribute methamphetamine. Jacobsen, Butler, and Fitzhugh were named as unindicted coconspirators. The indictment alleged that Jacobsen flew to California in February 1988 and met with Dudden near San Jose, where Dudden introduced Jacobsen to Hinck for the purpose of receiving two pounds of methamphetamine to be transported by Butler to Montana.
 
 
 13
 After a jury trial, Hinck was acquitted. Dudden was found guilty on the conspiracy count, and acquitted of the charge of distribution. She was sentenced to 37 months imprisonment.
 
 
 14
 Dudden appeals her conviction and her sentence. The government cross-appeals from the district court's decision to depart downward at sentencing.
 
 DISCUSSION
 I. Pre-indictment delay
 
 15
 Dudden was not indicted for the February 1988 methamphetamine transaction until January 22, 1993, just barely within the five-year statute of limitations. Dudden filed a pretrial motion to dismiss for pre-indictment delay, claiming that the government could have filed charges against her as early as July 1988, when Butler described the 1988 drug deal, or at least by the summer of 1990, when Jacobsen's debriefing identified Dudden as involved in the methamphetamine transaction. The district judge denied Dudden's motion, finding she had not shown prejudice or intentional delay by the prosecution.
 
 
 16
 This court reviews for an abuse of discretion the district court's decision not to dismiss an indictment for impermissible delay. United States v. Turner, 926 F.2d 883, 888 (9th Cir.), cert. denied, 502 U.S. 830, 112 S.Ct. 103, 116 L.Ed.2d 73 (1991).
 
 
 17
 In limited circumstances, due process requires the dismissal of an indictment brought before the end of the limitations period. United States v. Huntley, 976 F.2d 1287, 1290 (9th Cir.1992). Preindictment delay violates due process only if the defendant proves actual, nonspeculative prejudice from the delay, and if the length of the delay, when balanced against the reason for it, offends fundamental conceptions of justice. Id.
 
 
 18
 To demonstrate the actual prejudice required before the second part of the test is triggered, a defendant must show more than the mere loss of testimony, which generally is protected against by the statute of limitations. The defendant must show "by definite and non-speculative evidence how the loss of a witness or evidence is prejudicial to the defendant's case." Id. Findings on the issue of prejudice are reviewed under the clearly erroneous standard, keeping in mind the defendant's heavy burden. Id.
 
 
 19
 On appeal, Dudden cites lost bank, telephone, and employment records, and hotel registration receipts, "all of which could have been exculpatory and beneficial to her in the presentation of her defense at time of trial" (emphasis added). She does not show how these or the other records would have been exculpatory. Dudden claims the bank records could have shown that she made no unusually large cash deposits during the time of the drug deal. The failure to deposit cash payments, however, would not necessarily prove that payments were not made. Employment records that could have shown that Dudden was not working at the hotel the night of the transaction, and registration records that Dudden claims "would have either confirmed or denied" the government's version of events, might well have supported the prosecution's case. See United States v. Rogers, 722 F.2d 557, 562 (9th Cir.1983) (missing testimony that "might" have been useful does not show actual prejudice), cert. denied, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984).
 
 
 20
 We find no clear error in the district court's finding that Dudden did not show prejudice from the delay. The court therefore did not need to address the second part of the inquiry. Id. The district court did not abuse its discretion in denying Dudden's motion to dismiss the indictment.
 
 II. Outrageous government conduct
 
 21
 Dudden moved to dismiss the indictment for outrageous government conduct. She alleged that the government's motivation for indicting her was to coerce Hinck, her companion, into becoming a confidential informant in the Corporate Air investigation. This court reviews de novo the district court's denial of the motion. United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir.1992) (as amended), cert. denied, --- U.S. ----, 113 S.Ct. 1581, 123 L.Ed.2d 148 (1993).
 
 
 22
 "Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." United States v. Montoya, 45 F.3d 1286, 1300 (9th Cir.1995). The government action must violate the universal sense of justice. Id.
 
 
 23
 We hold that the government conduct in this case does not meet this standard. Indicting Dudden at least in part to encourage Hinck to cooperate, while not laudatory, is not outrageous. See id. (assuming without deciding that indictment of wife to induce defendant to plead guilty does not constitute outrageous government conduct).
 
 
 24
 We also hold that the judge did not err in refusing to give Dudden's proposed instruction on outrageous government conduct to the jury. "Whether the government's conduct is sufficiently outrageous to violate due process is a question of law.... It is not an issue for the jury and [the defendant] was not entitled to a jury instruction on this issue." United States v. Sotelo-Murillo, 887 F.2d 176, 182 (9th Cir.1989).
 
 III. Immunity
 
 25
 Dudden moved to dismiss the indictment on the ground that the government breached an informal immunity agreement. She claimed that the government used against her immunized statements she had given to the federal agents in connection with the investigation of Fitzhugh and Jacobsen. At the general hearing on Dudden's pretrial motions, Dudden testified that she was assured by Agents Brett and Zarndt that she would not be prosecuted on the basis of any information she provided. She argued that her statement to Agent Zarndt on August 10, 1990, that she was under the impression that Jacobsen was involved in methamphetamine, was given under an informal grant of immunity, and could not be used in her prosecution for the February 1988 methamphetamine transaction with Jacobsen. After hearing some additional testimony, the court refused to conduct a full hearing on the immunity issue.
 
 
 26
 In its ruling on Dudden's pretrial motions, the court found that the informal immunity agreement did not trigger the need for an evidentiary hearing. The court also found that Dudden's agreement with the government did not include immunity from prosecution on methamphetamine charges, and did not cover the time period referred to in the indictment. Dudden challenges that conclusion and the decision not to grant her a full hearing.
 
 
 27
 A. The scope of Dudden's informal immunity agreement
 
 
 28
 Immunity issues usually arise when a defendant refuses to testify before a grand jury or court on Fifth Amendment grounds. The government may compel the testimony over the defendant's claim of the privilege against self-incrimination, if it grants use and derivative use immunity to the defendant under 18 U.S.C. Sec. 6002, which provides that "no [compelled] testimony ... (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." Id.; see Kastigar v. United States, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972); United States v. Plummer, 941 F.2d 799, 802 (9th Cir.1991). "Use immunity" means that the compelled statements cannot be used against the defendant. Plummer, 941 F.2d at 803. "Derivative use immunity" means that the government must derive all the information used as the basis for any prosecution of the defendant from sources wholly independent of the defendant's statements. Id. The government may not use the statements to uncover other incriminating evidence, focus the investigation, decide to initiate prosecution, interpret other evidence, or otherwise plan trial strategy. Montoya, 45 F.3d at 1295; United States v. Crowson, 828 F.2d 1427, 1430 (9th Cir.1987), cert. denied, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988).
 
 
 29
 When, as in this case, the defendant has not been forced to testify and so has not claimed the Fifth Amendment privilege against self-incrimination, the government can grant the defendant varying degrees of immunity in an informal agreement. Plummer, 941 F.2d at 802. As with a grant of formal immunity under the statute, if the government informally promises that the statements will not be used against the defendant, it is also precluded from using the statements to uncover other incriminating evidence, unless the agreement expressly provides otherwise. Id. at 804-05.
 
 
 30
 We interpret informal immunity agreements using ordinary contract principles. Id. at 802. The standard of review of the district court's denial of Dudden's motion is the same as in civil contract cases: we review factual determinations for clear error, and we review de novo whether the facts show a violation of the contract. Id. at 803. If there is any ambiguity in the language of the immunity agreement, the ambiguity will be resolved against the government. Id. at 804.
 
 
 31
 The district court concluded that the immunity agreement "never included immunity from prosecution on methamphetamine distribution charges" and did not cover the time period alleged in the indictment (January to March 1988). That interpretation, however, is not supported by the terms of the agreement as described by Dudden and the federal agents, or as set forth in the letter from AUSA Seykora.
 
 
 32
 Dudden testified at the pretrial hearing that the agents told her "whatever information I provided, I would not be prosecuted for," and "I ... fully understood that I was under immunity, and I would have no criminal charges against me." The government did not argue that the agreement with Dudden was narrower in scope. The immunity letter prepared by AUSA Seykora and shown to Dudden at the United States Attorney's office in Billings stated that if Dudden testified at Jacobsen's trial, "the United States does not intend to prosecute you based on Title 21, U.S.C. violations which may be revealed and upon which prosecution could be based as a result of your testimony at the trial," with the exception of perjury and crimes of violence. While the letter was predicated on Dudden's testifying against Jacobsen, the government does not contend that the letter did not embody the terms of the oral agreement, which was not conditioned on Dudden's testimony, but was in exchange for the information she furnished to the agents. The letter protected Dudden against any prosecution for drug offenses, with no limitation as to the type of drug offense or the time thereof. There is thus no evidence that the immunity agreement was limited to cocaine charges, or to any particular time period.
 
 
 33
 We conclude that the informal immunity agreement extended to the prosecution of Dudden for conspiracy to distribute methamphetamine in 1988. It therefore was necessary for the district court to determine whether the government breached the immunity agreement, either by using the immunized statements against Dudden directly or by using the statements to help develop the prosecution's case. The remaining issue is whether a hearing was required to make that determination.
 
 
 34
 B. The failure to hold a full Kastigar hearing
 
 
 35
 Dudden also challenges the district court's refusal to hold a full evidentiary hearing. The court stated that such a hearing was not required when the grant of immunity was pursuant to an informal agreement, rather than under the statute. We review the court's refusal to hold a hearing for an abuse of discretion. Montoya, 45 F.3d at 1291.
 
 
 36
 Once the defendant has testified under a grant of statutory immunity, the government has the burden to prove that any evidence it intends to use against the defendant is derived from a legitimate source independent of the immunized statements. Kastigar, 406 U.S. at 461-62, 92 S.Ct. at 1665-66. Before trial, the government must prove the independent sources by a preponderance of the evidence. Crowson, 828 F.2d at 1429. A hearing usually is required to determine whether the government can meet its burden under Kastigar. In re Grand Jury Proceedings (Trimiew), 9 F.3d 1389, 1390 (9th Cir.1993); see Kastigar, 406 U.S. at 460, 92 S.Ct. at 1664-65.
 
 
 37
 The requirement that the government demonstrate independent sources for its evidence is not limited to cases in which the defendant has given compelled testimony and therefore has formal immunity under the statute. We recently declined to draw a constitutional distinction between compelled testimony given with a grant of statutory immunity and information given under an informal immunity agreement. United States v. Camp, 58 F.3d 491, 493 (9th Cir.1995). A Kastigar evidentiary hearing is equally appropriate when the claimed immunity is informal as when the immunity is statutory. See id. (remanding for Kastigar hearing when immunity agreement was informal); see also United States v. Quintanilla, 2 F.3d 1469, 1483 (7th Cir.1993) (informal immunity agreements implicate provisions of Kastigar, requiring government to show independent sources).
 
 
 38
 We hold that an informal immunity agreement may require a Kastigar hearing. It was therefore an abuse of discretion to deny a hearing merely because the immunity agreement was informal. We note, however, that even when statutory immunity is in issue, a hearing is not required if no factual issues are left to resolve, or if the government meets its burden to show independent sources through the use of affidavits. Montoya, 45 F.3d at 1298. The need for an evidentiary hearing when the immunity is informal also depends on the circumstances in each case.
 
 
 39
 The hearing on Dudden's pretrial motions stretched over two days. The district court heard testimony about the immunity agreement, and allowed cross-examination of Hinck, Dudden, and Agent Williams. Dudden's counsel argued that the government used Dudden's statement about Jacobsen's dealing in methamphetamine to bolster its presentation to the grand jury, as evidence of her knowledge of the methamphetamine distribution. The court cut short the testimony when Dudden's counsel attempted to call the other government agents involved in the investigation. In its ruling on the pretrial motions, the court made no finding whether Dudden's statements were used against her, instead concluding that the immunity agreement simply did not apply to the offenses alleged in the indictment.
 
 
 40
 The court's ruling therefore left unanswered questions regarding whether Dudden's statements were used in preparing the case against her. Because the informal immunity agreement was not limited to any particular type of drug offense or time period, we remand to the district court for a Kastigar hearing to determine the factual issue whether the government made direct or derivative use of Dudden's statements in its investigation and prosecution of the methamphetamine charges. If the district court finds that the government did use Dudden's immunized statements, either directly or in developing the case against her, Dudden's conviction must be set aside.
 
 C. Immunity instructions
 
 41
 Although we hold that the district court on remand should make a finding whether the government breached its informal immunity agreement with Dudden, we also conclude that the court properly refused to give Dudden's proposed immunity instructions to the jury. The first instruction described informal immunity, and asked the jury to find whether an informal agreement existed. The instruction also directed the jury to decide whether the government had established that Dudden's prosecution was based on evidence entirely independent from her immunized statements, citing Kastigar. A second proposed instruction stated that it was the jury's duty to find Dudden not guilty if it found a breach of the immunity agreement.
 
 
 42
 The instructions were properly refused as an incorrect statement of the law. The determination of the terms of an immunity agreement, and the decision whether the government has proven that it did not breach the agreement in preparing its case for trial, is not for the jury to make after trial. Instead, the judge must determine before trial whether the government has proven its independent sources, if necessary with a Kastigar hearing. See, e.g., Crowson, 828 F.2d at 1429; United States v. Lipkis, 770 F.2d 1447, 1450 (9th Cir.1985).
 
 IV. Limitation of cross-examination
 
 43
 Dudden argues that the district court abused its discretion when it limited cross-examination of Agent Williams, in which her counsel attempted to show bias against Hinck and Dudden.
 
 
 44
 The trial court has considerable discretion to limit cross-examination, and this court reviews a limitation for an abuse of that discretion. Carriger v. Lewis, 971 F.2d 329, 333 (9th Cir.1992) (en banc), cert. denied, --- U.S. ----, 113 S.Ct. 1600, 123 L.Ed.2d 163 (1993).
 
 
 45
 AUSA Seykora objected to Dudden's counsel's cross-examination of Agent Williams regarding confidential information about the involvement in drugs of Hinck's employer, Corporate Air. The defense was attempting to show that because the government knew the confidential information was not reliable, the government was trying to incriminate Hinck in methamphetamine distribution to bolster its case against Corporate Air. Dudden's counsel argued that Agent Williams was therefore biased against Hinck and Dudden when he presented the case to the grand jury. Outside the hearing of the jury and the attorneys, the court in chambers heard testimony from Agent Williams regarding the Corporate Air investigation, and then sustained the government's objection.
 
 
 46
 It was not an abuse of discretion to limit the defense's cross-examination of Agent Williams. Dudden has shown no reason why the court could not conclude, following its own in camera questioning of the witness, that it had the discretionary power to limit the questioning. Even if the cross-examination would have demonstrated a bias against Dudden, the jury knew that Agent Williams, as a law enforcement officer, was responsible for the investigation of Hinck and Dudden. "From these facts, the jury could reasonably infer that Agent [Williams] had an interest in the outcome of the case and was 'biased' against [Dudden]." United States v. Candoli, 870 F.2d 496, 504 (9th Cir.1989). Any additional showing of bias merely would have been cumulative. Id.
 
 V. Sentencing Issues
 A. Form of methamphetamine at sentencing
 
 47
 The drug methamphetamine exists in two isomeric forms, and the two isomers have profoundly different effects. The isomer levo-methamphetamine ("L-methamphetamine") produces "little or no physiological effect when ingested." United States v. Bogusz, 43 F.3d 82, 89 (3d Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995). Dextro-methamphetamine ("D-methamphetamine"), however, produces the high desired by the drug's users. Id. The Sentencing Guidelines therefore treat L-methamphetamine much less severely than D-methamphetamine. One gram of L-methamphetamine is equivalent to 40 grams of marijuana, while one gram of D-methamphetamine is equivalent to ten kilograms of marijuana. U.S.S.G. Sec. 2D1.1 at comment. n. 10. A defendant's sentence thus varies significantly depending on which variety of methamphetamine is involved.
 
 
 48
 In this "no dope" case, the two pounds of methamphetamine that Dudden was convicted of conspiring to distribute was never recovered or tested by the government. Nor did the government discover the laboratory where the drug was manufactured, or present any evidence of production method or materials. Nevertheless, the presentence report recommended that the district court calculate the two pounds of methamphetamine as D-methamphetamine rather than L-methamphetamine. Dudden objected to the classification.
 
 
 49
 The district judge, after hearing argument at the sentencing hearing, calculated Dudden's sentence as though the drug involved were D-methamphetamine. As a result, Dudden's base sentencing level was 26, which in Criminal History Category I called for a sentence of 63-78 months. Had the district court classified the drug as L-methamphetamine, her base sentencing level would have been 18, which calls for a range of 27-33 months.
 
 
 50
 Dudden challenges the district court's determination that the drug involved was the more potent D-methamphetamine. We review the district court's factual findings at sentencing for clear error. United States v. Buenrostro-Torres, 24 F.3d 1173, 1174 (9th Cir.1994). It is the government's burden to present evidence sufficient for the district court to find, by a preponderance of the evidence, that the drug involved was D-methamphetamine. See United States v. Harrison-Philpot, 978 F.2d 1520, 1522-23 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2392, 124 L.Ed.2d 294 (1993).
 
 
 51
 At the sentencing hearing, the only proof submitted by the government was two affidavits prepared for sentencing in a different case. The affidavit of DEA Senior Forensic Chemist Roger Ely stated that clandestine methamphetamine labs almost always manufacture D-methamphetamine or DL-methamphetamine, a mixture of D- and L-methamphetamine. He stated that he had never found pure L-methamphetamine, which has few, if any, stimulating properties. Ely also stated that a clandestine lab might manufacture L-methamphetamine by mistake.
 
 
 52
 The second affidavit, by DEA Senior Forensic Chemist Harry Skinner, stated that he had participated in the seizure of more than two hundred clandestine drug laboratories, and had never found any L-methamphetamine, whose manufacture, while possible, was not probable.
 
 
 53
 Maintaining that the government had not met its burden to show that the particular drug in this case was D-methamphetamine, Dudden's counsel pointed out that Jacobsen had testified that the methamphetamine looked "[k]ind of funny, orange.... It didn't look like anything I thought it would look like." Jacobsen also testified that it was so funny-looking that it was hard to sell. Fitzhugh testified that the drug was "different than any that I encountered before ... discolored ... almost a yellow-orangeish color" and that his wife had used it and said it was "not the best ... pretty different." Dudden's counsel suggested that this evidence was consistent with L-methamphetamine.
 
 
 54
 We must determine whether the district court clearly erred in concluding that the drug in this case was D-methamphetamine, based solely on expert affidavits regarding the predominance of D-methamphetamine in the drug marketplace. We agree with the Eleventh Circuit that "[t]here must be proof ... to justify the added deprivation of liberty that follows the scoring of the drug as D-methamphetamine." United States v. Patrick, 983 F.2d 206, 209 (11th Cir.1993); see United States v. Ramsdale, 61 F.3d 825, 832 (11th Cir.1995) (plain error to sentence defendants for conspiracy to manufacture D-methamphetamine when no evidence introduced as to type of methamphetamine); United States v. Wessels, 12 F.3d 746, 754 (8th Cir.1993) (remanding sentence for further findings when district court took judicial notice that drug was D-methamphetamine, based on court's own experience that none of its many methamphetamine cases involved L-methamphetamine), cert. denied, --- U.S. ----, 115 S.Ct. 105, 130 L.Ed.2d 53 (1994). When, as in this case, no direct evidence of the drug's chemical composition or the method of its manufacture is available, circumstantial evidence may be sufficient to determine which isomer is involved. See Bogusz, 43 F.3d at 91-92 & n. 17 (where no chemical analysis performed, circumstantial evidence may be sufficient for preponderance of evidence); United States v. Jennings, 12 F.3d 836, 838 (8th Cir.1994) (where eight drug samples attributed to the defendant tested for D-methamphetamine, no clear error to find all the methamphetamine was D-methamphetamine); United States v. Koonce, 884 F.2d 349, 352-53 (8th Cir.1989) (evidence supported inference that untested methamphetamine was part of earlier shipment that tested as D-methamphetamine).
 
 
 55
 In United States v. Lande, 40 F.3d 329, 331 (10th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1988, 131 L.Ed.2d 875 (1995), the government presented what appear to be identical affidavits from DEA Senior Forensic Chemists Ely and Skinner as evidence that the untested drug was D-methamphetamine. The government in Lande, however, also introduced a coconspirator's testimony that he had used the methamphetamine, which was of superior quality and had kept him up for two or three days at a time. Id. The Tenth Circuit held that the district court did not clearly err in finding D-methamphetamine based on the affidavits' statements that L-methamphetamine was rare and that the isomer had little stimulating effect, in combination with the testimony about the highly stimulating effect of the drug obtained from the defendant. Id.
 
 
 56
 In contrast, in Dudden's case the government presented no direct or circumstantial evidence beyond the affidavits to support a finding that the drug was D-methamphetamine. The defense presented the only evidence at sentencing regarding the appearance and the effect of the drugs, in the form of Fitzhugh and Jacobsen's trial testimony that the drugs were a strange color, hard to sell, and different in their effect on a user. This evidence arguably supports the conclusion that the drug was L-methamphetamine, which according to one of the government's own affidavits, can be manufactured accidentally in a clandestine laboratory.
 
 
 57
 Nevertheless, it was not the defense's burden to show that the drug was L-methamphetamine. It was the government's burden to produce evidence that the more potent D-methamphetamine was involved. To allow the expert affidavits submitted in this case, without more, to satisfy the government's burden to establish that the drug was D-methamphetamine, would shift to the defendant the burden of proving the kind of methamphetamine involved in any no-dope case. The government would meet its burden simply by producing similar general affidavits in each case, and the defense would then have the burden to produce evidence to refute the affidavits. See Ramsdale, 61 F.3d at 831 (government has burden of production and persuasion as to type of methamphetamine involved).
 
 
 58
 It was clear error to find that the drug in this case was D-methamphetamine. The two affidavits, without more, were insufficient to satisfy the government's burden to prove at sentencing what type of methamphetamine was involved. On remand, if the district court finds Dudden's immunity agreement was not breached, the court should resentence Dudden using the drug equivalency tables for L-methamphetamine.
 
 B. Downward departure
 
 59
 At sentencing, the district court found an offense level of 29 based on the potency of the methamphetamine and Dudden's role as a manager or supervisor. The court then departed down eight offense levels to sentence Dudden to 37 months imprisonment, a $2000 fine, and three years supervised release. The court summarized its reasons for downward departure. The government cross-appeals, challenging four of those grounds.
 
 
 60
 We need not address whether the court used valid grounds for its downward departure. If the court finds that the government did not breach Dudden's immunity agreement, resentencing will be required using the drug equivalency tables for L-methamphetamine. Because the sentencing range for L-methamphetamine in this case is 27-33 months imprisonment, the 37-month sentence originally imposed no longer represents a downward departure. It would be pure speculation for us to conjecture whether the judge will so depart, and upon what bases, upon resentencing.
 
 CONCLUSION
 
 61
 We vacate Dudden's sentence and remand to the district court. On remand, the district court should determine whether the government breached Dudden's immunity agreement by using her protected interview statements in its investigation. If so, the district court should dismiss the indictment. If the court concludes that the government did not breach the agreement, the court should resentence Dudden, using the guideline range for L-methamphetamine.
 
 
 62
 VACATED AND REMANDED.