United States Court of Appeals,

Eleventh Circuit.

No. 95-8988.

Tommy Michael REECE, Petitioner-Appellant,

v.

UNITED STATES of America, Respondent-Appellee.

Aug. 8, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (Nos. 4:92-CR-019-02-HLM, 4:95-CV-01-HLM), Harold L. Murphy, Judge.

Before TJOFLAT and BIRCH, Circuit Judges, and SMITH[*], Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Petitioner, Thomas Michael Reece, appeals from the district court's denial of his motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. We affirm.

I.

A.

On December 10, 1992, Reece was convicted in the District Court for the Northern District of Georgia on four counts of dealing in a controlled substance, methamphetamine. One count charged Reece with conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846; two counts charged him with distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and one count charged him with possession of that drug in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Because Reece committed these offenses after November 1, 1987, he was sentenced under the guidelines promulgated by the United States Sentencing Commission (the "Sentencing Commission").[1] On February 12, 1993, the district court

---

[*]Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

[1]The Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.,* which established the Sentencing Commission and the guideline sentencing scheme in place today, became effective on November 1, 1987. *See* Sentencing Reform Act of 1984, Pub.L. No. 98-473, § 235(a)(1), 98 Stat. 1837, 2031 (1984) (amended by Sentencing Reform Amendments Act of 1985, Pub.L. No. 99-217, § 4, 99 Stat. 1728, 1728 (1985)).

sentenced Reece to a term of seventy months imprisonment on each count, with the terms to run concurrently, and fined him a total of $5,000.

Reece appealed his convictions, but not his sentences. We affirmed his convictions without opinion under Eleventh Circuit Rule 36-1. *United States v. Reese,* 4 F.3d 1001 (11th Cir.1993) (Table, No. 93-8210).

B.

On January 4, 1995, proceeding *pro se,*[2] Reece petitioned the district court pursuant to 28 U.S.C. § 2255 to vacate his sentences and remand the case for resentencing. He presented alternative claims for relief. The first claim was that the district court, in fashioning Reece's sentences, misapplied the sentencing guidelines by using the guideline for cases involving D-methamphetamine.[3] According to Reece, the court should have used the guideline for L-methamphetamine. That guideline would have yielded an offense level of 14 and a sentencing range of 15 to 21 months imprisonment, rather than an offense level of 26 and a sentencing range of 63 to 78 months imprisonment as prescribed by the guideline for D-methamphetamine. Reece's second claim was that his attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment, by failing to object to the court's use of the D-methamphetamine guideline to fashion Reece's sentences.

In response, the Government contended that Reece had procedurally defaulted his first claim for relief (1) by failing to object (a) to the presentence investigation report's application of the D-

---

[2]Reece was represented by counsel at trial and on direct appeal. In this appeal of his section 2255 petition, Reece received the benefit of court-appointed counsel.

[3]The guidelines for the offenses at issue in this case and for the trafficking of all illegal drugs are found in United States Sentencing Commission, *Guidelines Manual,* § 2D1.1 (Nov. 1, 1992). To determine the sentencing range for D-methamphetamine, the court refers to the Drug Equivalency Tables, which are found in the commentary that immediately follows § 2D1.1. The tables state that D-methamphetamine, which is listed as "methamphetamine," is equal to one kilogram of marijuana; L-methamphetamine is equal to 40 grams of marijuana. For simplicity and clarity, we refer to the portions of § 2D1.1 and the equivalency tables pertaining to these two types of methamphetamine as the "D-methamphetamine guideline" and the "L-methamphetamine guideline."

methamphetamine guideline and (b) to the court's reliance on that guideline at the sentencing hearing; and (2) by failing to challenge his sentences on direct appeal from the district court's judgment. Reece's second claim was insufficient, the Government asserted, because his petition did not demonstrate that counsel's performance prejudiced his case as required by the ineffective assistance of counsel standard articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[4] More specifically, the petition did not allege that the case involved L-methamphetamine and that Reece could establish that fact if given an evidentiary hearing.

The district court rejected both of Reece's claims because the petition failed to demonstrate prejudice. With respect to his first claim, the court ruled that to overcome his procedural defaults, Reece had to show cause for the defaults—that is, an excuse for not objecting to the application of the D-methamphetamine guideline at his sentencing hearing and on direct appeal—and resulting prejudice. *See United States v. Frady,* 456 U.S. 152, 167-68, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982); *Cross,* 893 F.2d at 1289. The court held that Reece's petition failed to satisfy this standard because it did not allege that the methamphetamine trafficked was the L-type. The court then denied his second claim, which asserted ineffective assistance of counsel at the trial level, for the same reason: the petition failed to show that had counsel objected to the application of the D-methamphetamine guideline, the Government could not have established that the methamphetamine was the D-type.

Reece now appeals the district court's decision on both claims.

II.

---

[4]Under the familiar standard set forth in *Strickland,* a petitioner must satisfy two requirements to prevail on an ineffective assistance of counsel claim. He must show that (1) "counsel's representation fell below an objective standard of reasonableness," *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064, and that (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068. In this circuit, we have referred to the latter element as the "prejudice" prong and the former element as the "performance" prong. *See, e.g., Cross v. United States,* 893 F.2d 1287, 1290 (11th Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990). We need not consider the performance prong here because petitioner fails to satisfy the prejudice prong.

As a preliminary matter, we note that the district court's approach to evaluating Reece's section 2255 claims did not comport with the analytical framework prescribed by the Supreme Court in *United States v. Frady, supra,* and *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). *Murray* teaches that a prisoner collaterally attacking his conviction can establish cause for a procedural default if he can show that "some objective factor external to the defense impeded counsel's efforts to comply with the ... procedural rule," or that his attorney's performance failed to meet the *Strickland* standard for effective assistance of counsel. *Id.* at 488, 106 S.Ct. at 2645. Choosing the second option, Reece brought an independent Sixth Amendment claim of ineffective assistance of counsel. Because Reece did not pursue the first option by showing some external cause for his procedural default, the district court should have denied the first claim[5] and focused its attention solely on the second claim.

In this appeal, Reece does not cite an external cause excusing his procedural default. Accordingly, our review is restricted to Reece's claim that his attorney's performance failed to pass Sixth Amendment muster.

### A.

Reece's claim that his attorney's performance at the sentencing phase infringed his right to effective assistance of counsel fails because Reece has neither alleged nor shown that the methamphetamine he trafficked was the L-type. Simply put, he has failed to demonstrate that his attorney's performance prejudiced his case.

In his brief, Reece asks us to give his petition, which was filed and prosecuted *pro se,* the broadest possible reading—that is, to include an allegation that his trial attorney, who remained as

---

[5]The "actual innocence" exception to the cause and prejudice requirement does not apply to Reece's first claim because he does not dispute that he did traffick some form of methamphetamine. *See Murray,* 477 U.S. at 496, 106 S.Ct. at 2649-50 ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."). Such "actual innocence" must be established by "clear and convincing evidence." *See Sawyer v. Whitley,* 505 U.S. 333, 336, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269 (1992).

counsel through the direct appeal, rendered ineffective assistance in prosecuting that appeal. Without passing on whether the petition can reasonably be construed to include such an allegation, we treat the petition as alleging ineffective assistance of counsel at the appellate level. *See generally McCoy v. Wainwright,* 804 F.2d 1196, 1199 (11th Cir.1986) (construing appellant's *pro se* appeal liberally)

## B.

Reece contends that had his attorney requested this court on direct appeal to notice plain error, we would have vacated his sentence and remanded the case for a new sentencing hearing. Reece submits that any reasonably competent attorney would have made that request; hence, *Strickland* 's performance prong is satisfied. Reece further contends that the loss of a new sentencing hearing satisfies *Strickland* 's prejudice prong because, at a new hearing, the Government may not have been able to prove that the drug in question was D-methamphetamine.

Reece cites two cases involving methamphetamine—*United States v. Ramsdale,* 61 F.3d 825 (11th Cir.1995), and a case cited therein, *United States v. Patrick,* 983 F.2d 206 (11th Cir.1993)—for the proposition that we would have noticed plain error had counsel brought the alleged error to our attention. We remain unpersuaded.

Although both *Ramsdale* and *Patrick* considered on direct appeal whether the government's proof established that the drug at issue was D- rather than L-methamphetamine, neither case is apposite to the instant case. Unlike Reece, the defendant in *Patrick* made a timely objection at sentencing to the court's treatment of the drug as D-methamphetamine. *Patrick,* 983 F.2d at 210. After examining the relevant evidence, a panel of this court held that the evidence was insufficient to support the court's finding that the drug was D-methamphetamine. Consequently, the panel vacated the defendant's sentence and remanded the case for resentencing. *Patrick,* therefore, constitutes nothing more than a straightforward application of the "clearly erroneous" standard of review. *See id.* at 210-11.

5

*Ramsdale* involved a conspiracy under 21 U.S.C. §§ 841 and 846 "to transport phenylacetic acid ("PA'), a listed precursor chemical used in the manufacture of methamphetamine, from Florida to Oregon" for the purpose of manufacturing methamphetamine for distribution and sale. *Ramsdale,* 61 F.3d at 827. Drug Enforcement Administration agents arrested the appellants in Oregon at some point after their receipt of a shipment of PA. The question on appeal was "whether it is plain error to impose a sentence based upon D-methamphetamine in *the absence of any evidence* as to the type of methamphetamine involved in the criminal activity." *Id.* at 832 (emphasis added).[6] The court answered the question in the affirmative. Having done so, the court concluded that the government's proof was inadequate as a matter of law, vacated the sentences, and remanded the case for resentencing. *See id.*[7] In light of this disposition, we construe *Ramsdale* as a sufficiency of the evidence case standing for the unremarkable proposition that the prosecution has the burden of providing a factual basis for the defendant's sentence. *See generally Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979) (finding that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof").[8]

---

[6]The record in *Ramsdale* was replete with evidence that the appellants, who were methamphetamine traffickers, achieved their objective of transporting PA from Florida to Oregon. What was lacking was proof that the appellants intended to manufacture D-methamphetamine, as opposed to some other type of methamphetamine.

[7]After concluding that there was no evidence in the record to support the sentencing court's finding that D-methamphetamine was involved, the *Ramsdale* panel vacated the defendants' sentences and remanded "for resentencing, at which time the government [was required to] meet its burden of proof under *Patrick.*" *Ramsdale,* 61 F.3d at 832. Having failed to make out a case for D-methamphetamine the first time around, the government received a second chance—a second bite of the apple—to make its case. This disposition would have been justified had the government not received its day in court on the methamphetamine issue if, for example, the sentencing court had precluded the government from putting on its evidence. In *Ramsdale,* however, that was clearly not the case. Although the government had its day in court, its evidence simply failed the sufficiency test. It remains to be seen whether *Ramsdale* 's holding—that the government is entitled to a second chance to present evidence after presenting an inadequate case—will be applied to other cases in which the government's proof fails on a sentencing issue for which it bears the burden of proof.

[8]We note that two of the three other circuits that have considered this particular issue on direct appeal did not apply the reasoning used in *Ramsdale. See United States v. Scrivner,* 114 F.3d 964, 970 (9th Cir.1997) ("[W]here defendants do not object at trial or sentencing about the type of methamphetamine involved in their case, it is not plain error for a district court to

C.

Putting *Ramsdale* and *Patrick* aside, we will assume for the sake of argument that had Reece's attorney requested this court on direct appeal to notice plain error, the court would have granted the request, vacated Reece's sentences, and remanded the case for resentencing. The question thus becomes whether such a disposition—and the possibility that, on resentencing, the Government's proof on D-methamphetamine might fail—would satisfy the *Strickland* prejudice prong. The Supreme Court's ruling in *Frady, supra,* teaches that the plain error disposition Reece suggests would not satisfy that prong.

*Frady* was a proceeding brought under 28 U.S.C. § 2255. Frady, having been convicted of murder and sentenced to death, sought the vacation of his conviction on the ground that the trial judge had erred in instructing the jury on the meaning of "malice." *See Frady,* 456 U.S. at 157-58, 102 S.Ct. at 1589. Because Frady did not challenge the instructions in the trial court or on direct appeal, the question for the district court in the section 2255 proceeding was whether Frady had shown cause for his procedural default and actual prejudice. The district court, finding that Frady had demonstrated no excuse for the default, denied relief. *See id.* at 158, 102 S.Ct. at 1590. The court of appeals, however, reversed. Concluding that the challenged jury instructions were plainly erroneous and that the error would have been considered "plain error" under Fed.R.Crim.P. 52(b) had it been noticed on direct appeal, the appellate court found that Frady had demonstrated sufficient excuse to avoid his procedural default and, coincidentally, to obtain section 2255 relief. *See id.*

---

sentence those defendants based on their involvement with the more common methamphetamine, without making a factual finding to classify the methamphetamine as D-meth, as opposed to L-meth."); *United States v. Deninno,* 29 F.3d 572, 580 (10th Cir.1994) (finding no plain error because the defendant had failed to object at sentencing to the scoring of the methamphetamine, because "factual disputes do not rise to the level of plain error," and because "[t]he type of methamphetamine is a factual issue for the sentencing court to determine"), *cert. denied,* 513 U.S. 1158, 115 S.Ct. 1117, 130 L.Ed.2d 1081 (1995); *but cf. United States v. Bogusz,* 43 F.3d 82, 89-90 (3d Cir.1994) (disagreeing, in dictum, with "the *Deninno* court's holding that the determination of methamphetamine type is entirely a factual question that cannot rise to the level of plain error"), *cert. denied,* 514 U.S. 1090, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995).

7

The Supreme Court granted certiorari to answer the question presented by the court of appeals' holding: whether the Rule 52(b) plain error standard employed on direct appeal from a conviction "applies on a collateral challenge to a criminal conviction brought under [section 2255]." *Id.* at 154, 102 S.Ct. at 1587. The Court answered the question in the negative. In doing so, the Court compared and balanced the interests at stake on direct appeal and on collateral attack:

> Rule 52(b) was intended to afford a means for the prompt redress of miscarriages of justice. By its terms, recourse may be had to the Rule only on appeal from a trial infected with error so "plain" the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it. The Rule thus reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed.

> Because it was intended for use on direct appeal, however, the "plain error" standard is out of place when a prisoner launches a collateral attack against a criminal conviction after society's legitimate interest in the finality of the judgment has been perfected by the expiration of the time allowed for direct review or by the affirmance of the conviction on appeal.

*Id.* at 164, 102 S.Ct. at 1592.

The Court therefore concluded that

> the proper standard for review of [a trial court error presented in a section 2255] motion is the "cause and actual prejudice" standard [stated] in ... *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Under this standard, to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) "cause" excusing his double procedural default, and (2) "actual prejudice" resulting from the errors of which he complains.[9]

*Id.* at 167-68, 102 S.Ct. at 1594. According to the Court, "actual prejudice" is "not merely that the errors at [the defendant's] trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 170, 102 S.Ct. at 1596.

*Frady* disposes of Reece's argument that a section 2255 court may review a procedurally defaulted claim if the court concludes that the court of appeals, on direct appeal, would have noticed plain error had the error been brought to its attention. Rather, a section 2255 court may excuse a

---

[9]A "double procedural default" occurs when, as in *Frady,* the defendant neither objects in the trial court nor on direct appeal.

procedural default only if the defendant satisfies the cause and prejudice standard stated in *Wainwright v. Sykes*. In other words, unless the defendant can show that "some objective factor external to the defense impeded counsel's efforts to comply with the ... procedural rule," *Murray,* 477 U.S. at 488, 106 S.Ct. at 2645, the defendant must demonstrate that the default was caused by his attorney's ineffective assistance and actual prejudice resulted—that is, he must satisfy the *Sykes* standard. *See id.* at 488-89, 106 S.Ct. at 2645-46.

In sum, to obtain section 2255 relief in this case, Reece must show that his attorney's performance was constitutionally deficient and actually prejudiced his case. As for the prejudice element, Reece can satisfy his burden only if he represents that, given an evidentiary hearing, he can establish that the methamphetamine he possessed and distributed was the L-type. Reece makes no such representation.

D.

We believe that, unlike the parties in *Ramsdale,* Reece and the Government agreed to the application of the D-methamphetamine guideline because there was no doubt that the methamphetamine involved in the case was the D-type. We draw this conclusion based on the evidence in the case and from what several circuit courts, the Sentencing Commission, the Drug Enforcement Administration (DEA), and the National Institute on Drug Abuse (NIDA) have said about methamphetamine.[10] We first consider what these sources have said and then examine the evidence that was before the district court when it sentenced Reece.

1.

Methamphetamine is a potent drug "having a devastating impact in many communities across the nation." Drug Enforcement Admin., U.S. Dep't of Justice, *Methamphetamine: A Growing Domestic Threat* (last visited July 20, 1997) <http://www.usdoj. gov/dea/pubs/ meth/threat.htm> [hereinafter *DEA* ]. Usually taking the form of a white, odorless, and bittertasting crystalline powder,

---

[10]We take judicial notice of what the courts of appeals, the Sentencing Commission, the DEA, and NIDA have said about methamphetamine. Their commentary on the subject is essentially indisputable.

9

methamphetamine gives users a euphoric effect similar to but longer lasting than cocaine. National Institute on Drug Abuse, *Facts About Methamphetamine* (last visited July 20, 1997) <http://165.112.78.61/ NIDA_Notes /NNVol11N5/Tearoff.html> [hereinafter *NIDA* ].[11] Based primarily in Mexico and in the southwestern and western United States, clandestine methamphetamine laboratories generally utilize one of two methods to produce the drug. *See DEA* at <threat.htm>. The fundamental difference between the two methods is the use of different precursor chemicals. *See id.* The most popular method uses ephedrine or pseudoephedrine, which accounted for 89 percent of all methamphetamine laboratory seizures reported to the DEA in 1995. *See id.* The P2P method uses phenyl-2-propanone,[12] which accounted for 6 percent of all methamphetamine laboratory seizures in that year. *See id.*[13]

---

[11]As NIDA has observed, methamphetamine is a powerful stimulant:

> Even small amounts of methamphetamine can produce euphoria, enhanced wakefulness, increased physical activity, decreased appetite, and increased respiration. Other central nervous system effects include athetosis (writhing, jerky, or flailing movements), irritability, insomnia, confusion, tremors, anxiety, aggression, hyperthermia, and convulsions. Hyperthermia and convulsions sometimes can result in death.

> \* \* \* \*

> Psychological symptoms of prolonged methamphetamine abuse can resemble those of schizophrenia and are characterized by paranoia, hallucinations, repetitive behavior patterns, and formication (delusions of parasites or insects on the skin). Methamphetamine-induced paranoia can result in homicidal or suicidal thoughts.

    *NIDA* at <Tearoff.html>.

[12]Some methamphetamine producers manufacture their own P2P from phenylacetic acid (PA). *See* DEA at <threat.htm>. This is what the appellants in *Ramsdale* conspired to do. See discussion of *Ramsdale* in Part II.B, *supra*.

[13]Although these two methods account for most of the methamphetamine trafficked in this country, illegal laboratories have devised many other ways to produce methamphetamine. *See generally* Matt Campbell, *Steps Ahead of the Law, Risky Recipe Evolves,* Kan. City Star, June 30, 1996, at A20, A20 (stating that "[l]aw enforcement officials have identified about 48 methamphetamine "recipes' ").

These clandestine laboratories attempt to synthesize methamphetamine that maximizes the presence of dextro- or D-isomer,[14] a form of the methamphetamine molecule that "accounts for most of the stimulant effects associated with [the drug]." *See DEA* at <threat.htm> n.1. In fact, the ephedrine/pseudoephedrine reduction method has become the preferred route of synthesis largely because it produces substantially more D-isomer than the P2P method. *See id.* and accompanying text.

The D-isomer is the defining characteristic of D-methamphetamine. This circuit has identified D-methamphetamine as the substance having "the active physiological effects characteristic of [methamphetamine]." *United States v. Carroll,* 6 F.3d 735, 743 (11th Cir.1993), *cert. denied,* 510 U.S. 1183, 114 S.Ct. 1234, 127 L.Ed.2d 577 (1994). In contrast, the levo or L-isomer is the structural form present in L-methamphetamine: "an inert form [of methamphetamine] with little or no physiological effects." *Id.*[15] The current version of the sentencing guidelines underscores this important distinction between the two forms of methamphetamine, stating that L-methamphetamine "is rarely seen and is not made intentionally, but rather results from a botched attempt to produce d-methamphetamine." *See* U.S.S.G.App. C., amndt. 518, at 423 (Nov. 1, 1995).

Other circuits, such as the Ninth Circuit, have recognized that D-methamphetamine and L-methamphetamine have "profoundly different effects." *United States v. Dudden,* 65 F.3d 1461, 1470 (9th Cir.1995); *see also United States v. McMullen,* 98 F.3d 1155, 1156 (9th Cir.1996) (finding that "L-methamphetamine produces little or no effect when ingested, whereas D-methamphetamine produces an intense high"), *cert. denied,* --- U.S. ----, 117 S.Ct. 2444, 138 L.Ed.2d 203 (1997). The Third Circuit has observed that while D-methamphetamine "produces the physiological effect desired by [the drug's] users," L-methamphetamine has "little or no physiological effect when

---

[14]Isomers " "are compounds that have the same molecular formula but different structural formulas.' " *Bogusz,* 43 F.3d at 88 (citing Harold Hart, *Organic Chemistry: A Short Course* 15 (6th ed.1983)).

[15]In *Bogusz,* the Third Circuit provides a thorough examination of the differences in organic composition between D- and L-methamphetamine. *See Bogusz,* 43 F.3d at 88-89.

11

ingested." *Bogusz,* 43 F.3d at 89 (citation omitted); *see also United States v. Apfel,* 97 F.3d 1074, 1075 (8th Cir.1996) (same). It suffices to say that users of methamphetamine want to obtain D-methamphetamine, not L-methamphetamine, because the latter form has little or no physiological effect, is rarely seen and is not made intentionally, and is utterly worthless. *See United States v. Scrivner,* 114 F.3d 964, 966 (9th Cir.1997) (observing that D-methamphetamine has street value, whereas L-methamphetamine does not).

2.

21 U.S.C. §§ 841 and 846 proscribe trafficking and conspiring to traffick controlled substances, respectively. Although methamphetamine is listed as a controlled substance in section 841, that statute draws no distinction between different types of methamphetamine. *See* 21 U.S.C. § 841(b)(1)(A)(viii) & (B)(viii). Thus, under this statutory scheme, defendants whose offenses involved equal amounts of different types of methamphetamine are subject to the same mandatory sentence.[16]

The sentencing guidelines that were in effect when petitioner's case went to trial, however, treated offenses involving D-methamphetamine more severely than those involving L-methamphetamine. Under those guidelines, one gram of D-methamphetamine was equivalent to one kilogram of marijuana, whereas one gram of L-methamphetamine was equivalent to only forty

---

[16]Congress has prescribed the same mandatory sentence for D- and L-methamphetamine although, as noted above, L-methamphetamine has little or no physiological effect and thus no street value. The most likely reason for this identical treatment is that, as the Sentencing Commission stated in the current version of the guidelines, L-methamphetamine "results from a botched attempt to produce d-methamphetamine." U.S.S.G.App. C., amndt. 518, at 423 (Nov. 1, 1995). Thus, the manufacture of L-methamphetamine is proof of an attempt to manufacture D-methamphetamine, which has significant street value and presents a menace to society. Accordingly, in prescribing a lower sentencing range for cases involving L-methamphetamine, the guidelines in effect at the time of Reece's sentencing hearing simply reflected the difference between attempting to manufacture D-methamphetamine and distributing the drug. The current version of the guidelines eliminates the distinction between D- and L-methamphetamine. *See id.* at 423-24.

grams of marijuana. *See* U.S.S.G. § 2D1.1, comment. (n.10) (Drug Equivalency Tables) (Nov. 1, 1992).[17]

3.

When we examine the evidence before the district court at the sentencing hearing against this background, it becomes quite obvious that the methamphetamine trafficked in this case was the D-type. The evidence consisted of the testimony adduced at Reece's trial and the undisputed facts contained in the presentence investigation report prepared by the court's probation office. The trial transcript discloses the following.

Reece was a truck driver who made cross-country trips for a carpeting company. At some point, Reece learned that methamphetamine was available in California and Texas, and his half-brother, Junior Lawrence, agreed to traffick the drug for him in Georgia. Reece would obtain methamphetamine during his travels and "front" it to Lawrence, who would sell the drug on the street and pay what he owed Reece from the proceeds.

Their activity was discovered during a Federal Bureau of Investigation (FBI) investigation of methamphetamine trafficking in northern Georgia. FBI agents had arrested Kenneth Bennett for distributing methamphetamine; while awaiting sentence after pleading guilty to a federal drug charge, Bennett began cooperating with the agents. On August 25, 1992, Bennett purchased from Lawrence 5.5 grams of methamphetamine, which Reece had fronted; Bennett promptly turned the drug over to the FBI agents conducting the investigation. On September 8, 1992, he purchased another 113.6 grams, which Reece had also supplied to Lawrence, and gave the drugs to the agents. At the conclusion of this transaction, the FBI arrested Lawrence, searched his residence (where the

---

[17]Those guidelines recognized four types of methamphetamine: (1) "methamphetamine," which refers to a substance containing D-methamphetamine; (2) "methamphetamine (actual)," which is pure or uncut D-methamphetamine; (3) "ice," which is a substance containing D-methamphetamine of at least 80% purity; and (4) "L-methamphetamine." U.S.S.G. § 2D1.1, comment. (n.10) (Drug Equivalency Tables) (Nov. 1, 1992). Under those and the current guidelines, methamphetamine (actual) and ice are treated much more harshly than D-methamphetamine: one gram of methamphetamine (actual) or ice is equivalent to ten kilograms of marijuana. *See id.;* U.S.S.G. § 2D1.1, comment. (n.10) (Drug Equivalency Tables) (Nov. 1, 1995).

sale had taken place), and found an additional 54.2 grams in Lawrence's bedroom.[18] Laboratory tests revealed that the drugs obtained from these three occasions contained methamphetamine.

Given the evidence before the district court, it is clear that Reece possessed and, through Lawrence, distributed a form of methamphetamine that had street value—that is, the drug was D-methamphetamine. To reach a contrary conclusion would require us to find that Reece made a conscious decision to distribute a worthless substance. We decline to accept an explanation for Reece's criminal behavior that ignores the evidence before the district court, disregards the basic information about the drug, and defies common sense. We thus conclude that there could have been no dispute in this case that the methamphetamine Reece possessed and distributed was the D-type.[19]

The district court's denial of Reece's motion to vacate his sentence under section 2255 is therefore

AFFIRMED.

---

[18]At sentencing, Reece admitted to providing Lawrence with the 119.1 grams of methamphetamine that were sold to Bennett on August 25 and September 8. Reece, however, denied any involvement with the additional 54.2 grams found in Lawrence's residence. The court resolved this issue—the only issue of fact that the parties presented to the court at sentencing—against Reece.

[19]We note that our analysis in this case accords with the reasoning of the majority of circuits that have considered this precise issue on collateral attack. *See United States v. McMullen,* 98 F.3d 1155, 1157-58 (9th Cir.1996) (holding that petitioner, who did not raise the methamphetamine-type issue at sentencing or on direct appeal, was barred from raising that issue for the first time in § 2255 motion, and that petitioner did not satisfy either the performance prong or prejudice prong of ineffective assistance of counsel standard), *cert. denied,* --- U.S. ----, 117 S.Ct. 2444, 138 L.Ed.2d 203 (1997); *United States v. Apfel,* 97 F.3d 1074, 1077 (8th Cir.1996) (finding that petitioner "ha[d] not met his heavy burden of showing a reasonable probability that his sentence would have been different if his counsel had required the government to prove that the offense involved d-methamphetamine"); *United States v. Acklen,* 97 F.3d 750, 751 (5th Cir.1996) (holding that defendant failed to establish prejudice from counsel's failure to argue at sentencing that drug involved was L-methamphetamine and not D-methamphetamine), *cert. denied,* --- U.S. ----, 117 S.Ct. 1017, 136 L.Ed.2d 893 (1997); *but see United States v. Glover,* 97 F.3d 1345, 1350 (10th Cir.1996) (finding that counsel's failure to raise methamphetamine-type issue at sentencing satisfied prejudice prong of *Strickland,* and ordering the vacation of sentence if the government, on remand to the district court, could not establish that the substance was in fact D-methamphetamine).